(102 So. 861)

No. 25808.

STRAUSS v. INSURANCE CO. OF NORTH AMERICA et al.

(Jan. 5, 1925.)

*(Syllabus by Editorial Staff.)*

1. **Insurance ⬳665(3)—Attempt to change books and inventory to defraud government of income tax held not shown.**

In action on fire insurance policy, providing for forfeiture for fraud, concealment, or misrepresentation, evidence *held* insufficient to show that plaintiff attempted to change his books and inventory to defraud government of income tax by deduction of arbitrary sum from listed value of stock on hand.

2. **Evidence ⬳75—No presumption against insured not producing private pocket memorandum book in action on fire policy.**

In action on fire policy, insured's nonproduction of private pocket memorandum book kept by him for noting errors discovered in taking stock *held* not to authorize presumption arising against one failing or refusing to produce evidence in his possession.

3. **Fraud ⬳50—Fraud never imputed, except on legal and convincing evidence.**

Fraud is never imputed, except on legal and convincing evidence produced by one alleging it.

4. **Contracts ⬳94(1)—"Fraud," as applied to contracts, defined.**

"Fraud," as applied to contracts, is cause of error bearing on material part of contract, and created or continued by artifice, with design to obtain unjust advantage to one party, or cause inconvenience or loss to other.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fraud.]

5. **Insurance ⬳665(7)—False swearing by insured on examination by adjusters as to changes in books held not shown.**

That insured, who was not bookkeeper, was able to give more information in greater detail as to errors discovered in inventory and their correction on books by his bookkeeper at time of trial of action on policy, after having had full opportunity to go over books and refresh his memory, than on examination by insurance adjusters, *held* not to show that his failure to explain to them where and how changes had been carried in books constituted false swearing within policy.

6. **Insurance ⬳553(1)—False statements in proofs of loss by fire must have been made with intent to deceive insurer concerning matter material to insurance to defeat recovery.**

For false swearing in proofs of loss to prevent recovery on fire policy assured must have made false statements knowingly and willfully, with intent to deceive insurer concerning matter material to insurance.

7. **Insurance ⬳665(7)—Intent to deceive insurers as to fact and purpose of changes in books, and material effect thereof on insurers' rights, held not shown.**

Evidence *held* not to show that insured knowingly and willfully intended to deceive insurance companies as to fact or purpose of changes in books showing amount of stock on hand, or that matter materially affected insurers' rights; plaintiff's loss being far in excess of total insurance in any event.

8. **Appeal and error ⬳994(3)—Trial judge's conclusion that insured was not guilty of fraud and false swearing not disturbed on appeal.**

Conclusion of trial judge, who saw and heard insured testify, that he was not guilty of alleged fraud and false swearing in violation of policy will not be disturbed in absence of manifest error.

Appeal from the Twenty-Second Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

Action by Henry Strauss against the Insurance Company of North America and another. Judgment for plaintiff, and defendants appeal. Affirmed.

St. Clair Adams, of New Orleans, for appellants.

Laycock, Borron & Laycock, and Charles A. Holcombe, all of Baton Rouge, for appellee.

THOMPSON, J. This suit is upon a contract of fire insurance, and is for $2,000 with legal interest and 12 per cent. penalty, and for $200 attorney fees. The defense is that of fraud and false swearing alleged to have

been committed by the plaintiff in violation of certain provisions of the policy.

The fraud is founded on the allegation that the plaintiff submitted false and fraudulent proof of loss, which proof of loss was predicated upon the books of account and an inventory made or caused to be made by said plaintiff of his goods, wares, and merchandise, and which said inventory was a false and fraudulent account and schedule of the property of the plaintiff; that said false and fraudulent inventory was part of a systematic scheme to conceal and misrepresent the true and correct condition of plaintiff's business and property; the said scheme was carried out by plaintiff by means of divers false and fraudulent entries on his books of account and on the said inventory; the result being that said plaintiff has submitted to defendants a proof of loss and a statement of his loss that is based on books, papers, and an inventory that are untrue and fraudulent.

The false swearing is predicated on the following alleged facts: That in course of examination under oath plaintiff falsely swore to divers matters relating to said insurance and the subject-matter thereof; that plaintiff swore falsely with respect to his books of account, papers, and inventory, as to erasures in said books and inventory, as to his knowledge and part in making of said erasures, as to substitutions of new figures for the figures erased, in regard to the erasures, additions, and forced totals in said inventory, and otherwise swore falsely respecting his said insurance and the subject-matter thereof.

The stipulation of the policy under which forfeiture of all right to recover is claimed by reason of the alleged fraud and false swearing is as follows:

"This entire policy shall be void if the insured has concealed or misrepresented in writing or otherwise any material fact or circumstance concerning this insurance, or the subject thereof, * * * or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

The trial in the court below resulted in a judgment in favor of the plaintiff for the amount of the policy, with interest, and 12 per cent. penalty. The demand for attorney fees was rejected as in case of nonsuit.

The plaintiff was a merchant in the city of Baton Rouge, and his stock consisted of dry goods, ready-made clothing, and such other merchandise as is usually kept for sale in such a business. On September 27, 1919, the plaintiff's store with its entire contents was destroyed by fire—the fire having been communicated to the plaintiff's store from an adjoining building where it originated.

At the time of the fire the stock of merchandise which plaintiff had on hand amounted to a sum in excess of $50,000, and the total insurance, including the policy with the defendants, amounted to $28,700.

In due course the plaintiff furnished proofs of loss and submitted his books for examination.

An extra or quasi judicial examination and investigation of the plaintiff's books and papers was conducted by insurance adjusters, assisted by counsel representing the defendant companies, at which investigation the plaintiff and his bookkeeper were examined at great length and their testimony reduced to writing.

It was the information—largely, if not wholly—obtained from the stated investigation that prompted the defendants to decline payment of the insurance and to make the charge of fraud and false swearing against the plaintiff.

It may be well to state that there is no charge in the defendants' answer nor any intimation or suggestion in the evidence that the plaintiff was in any manner responsible for the fire or that he contributed in the slightest degree to his loss. It is a fact un-

disputed that the actual loss was far in excess of the aggregate amount of insurance carried with all the companies.

It is not pretended that the changes, erasures, and substitutions claimed to have been made in the books and inventory represented an increase of the stock of merchandise on hand, or that such changes were made with that purpose in view.

On the contrary, it is an admitted fact that the changes were intended to show and did in fact show a reduction of the amount of the stock of merchandise as represented by the books and the inventory before the changes were made.

It would appear from this fact that there was an entire absence of any motive or intent on the part of the plaintiff to deceive or to defraud the insurance companies, and this, we understand, is now conceded by the companies.

It is contended, however, that, although the change of entries in the books and on the inventory had not the effect of inflating the amount of stock on hand, and notwithstanding the fact that there was no intent to defraud the insurance companies, the said changes were yet dishonest and fraudulent, and were made for the purpose of decreasing the amount of income tax due or that would be due the United States government.

There can be no doubt that changes which reflected different results were made by erasures and substitutions in the accounts as exhibited on the plaintiff's books and on the inventory. Indeed, this fact is admitted by the plaintiff. Whether such changes, erasures, and substitutions were mere corrections of errors, honestly made for the purpose of showing the true condition of plaintiff's business, and to show the exact amount of stock on hand at the time of taking the inventory, or were dishonest and fraudulent, and made to reduce the income tax, and thus defraud the government, is one of the issues to be decided.

[1] A review of the evidence shows that the inventory which has occasioned this controversy was made at the beginning of the year 1919, some eight months before the fire. It was taken in accordance with the usual and customary manner of taking stock; that is to say, the clerks of the various departments listed upon uniform slips prepared for the purpose the goods in their respective departments, entering the class and character of goods and the quantity and cost price. These slips or memorandums were passed to the office, were checked over, and entered upon the inventory book. Having served their purpose, the slips were thereafter destroyed.

On going over the inventory the plaintiff detected quite a number of errors in the quantity and price of goods listed, of which errors he made note, and to which he called the attention of his bookkeeper and instructed him to make the corrections on the ledger and on the inventory. The errors amounted to $4,-909. If the corrections had been properly made by the bookkeeper, as the plaintiff, who had the utmost confidence in his honesty and competency, had the right to assume they would be made, the inventory and the books would have disclosed the purpose of the changes, and would have clearly presented a correct statement of the amount of the inventory and a true condition of plaintiff's business, and there would have been no room for even a suspicion of fraud or wrongdoing.

The bookkeeper, however, in a clumsy and negligent manner, not in keeping with the practice of an experienced and competent bookkeeper, erased and changed the total of the inventory, and substituted figures which showed an arbitrary deduction of $5,000. This fixed and arbitrary amount was carried into the several accounts on the ledger by erasing figures with a penknife and substituting other necessary figures to accomplish the deduction of the arbitrary amount. The bookkeeper did not concern himself with

the truth of the errors he was attempting to correct, and he made no effort to verify the correctness of his work.

He made out the plaintiff's income tax return, and he made the proofs of loss presented to the insurance companies after the fire, all from the books as he had kept them and as he himself had corrected them. And he testified that he never thought and had no reason to think that the corrections which he had been directed to make were dishonest and were to accomplish a fraudulent design.

As an evidence of his method of making the corrections we refer specially to the closing page of the inventory. There he erased the second figure from the left, which was a 7, and substituted therefor the figure 2, thereby making an enforced total of $42,325.73 instead of the original total of $47,325.73.

He made no entry explaining the change, and did not add up the column to verify the correctness of the total he placed there. There were no other deductions or changes made in the last two pages of the inventory which contained the recapitulations of the stock described on the preceding pages, from which it necessarily follows that the actual total remained the same as originally made, and the substituted arbitrary total was consequently false and untrue.

Then again, there appears to have been an erasure at the bottom of page 72 of the inventory book where the total of the recapitulations brought from the preceding pages should have been·made, and a like erasure appears at the top of page 73, where the total from the preceding page should have been brought forward. Much stress is laid upon this erasure as furnishing indubitable evidence of an attempted doctoring of the books in carrying out the scheme to defraud the government. We regard the circumstance as being without the least significance. If the totals had once been placed there and then erased as claimed, the fact of erasure and the failure to carry the total forward from page 72 to 73 would not have changed the amount of stock actually entered and described on the preceding pages and the recapitulation pages, which amount could have been readily ascertained by adding up the columns. The erasure was therefore in no way misleading.

There are 24 pages of the ·book containing the inventory and recapitulations, and in not a single instance is a total carried forward from one page to another, and in many instances the total of the page is not shown at the bottom of the page.

These are fair, if not the leading, samples of the changes, erasures, substitutions, and subtractions in plaintiff's books and on the inventory upon which the charge of concealment and fraud is based. They all relate to and revolve around the arbitrary reduction of $5,000 made by the bookkeeper, and admittedly had no effect whatever on the rights of the insurance companies.

There is some conflict between the testimony of the plaintiff and his bookkeeper as to the manner in which the correction of the errors was directed to be made. The bookkeeper swears that the plaintiff instructed him to make a flat deduction of $5,000, first in the accounts on the ledger and then in the inventory, and that he did as directed. This is denied by the plaintiff, who swears that when he discovered the errors in the amount of the stock as shown on the inventory he called the attention of the bookkeeper to such errors and told him to make the corrections in the inventory and in the books.

The bookkeeper admits that the plaintiff advised him that there was a mistake in the inventory, and that he went immediately to the ledger and made the necessary corrections. He admits also that at the time he was instructed to correct the books that the plaintiff had some memorandums in his hands. While he denies that the plaintiff

submitted to him a memorandum book containing a list of the errors and mistakes, he does say that the plaintiff had such a book in his possession for keeping accounts in taking the inventory. Notes of evidence, page 104.

We quote in part from his testimony on page 109 as follows:

Q. "Did you or not tell us that at that time that you had made those changes from a memorandum Mr. Strauss had in his hand?
A. "I said he had a memorandum in his hands, yes sir.
Q. "Didn't you tell us that he read them off to you and that you corrected the errors?
A. "I said that he pointed out the errors to me in the—book—in the inventory book."

We quote again from his testimony on page 115, as follows:

Q. "Then why didn't you call his attention to the fact—call the attention of Mr. Strauss to the fact that the corrections should be made in the inventory first?
A. "Well, I calculated the inventory and posted it to the general ledger, and then the mistakes were deducted afterwards.
Q. "Now, you say you knew they should have gone first in the inventory; you admit that as a fact.
A. "Yes, sir.
Q. "Were you not asked the question whether or not it was a fact that they were first made in the inventory and afterwards in the other books; and didn't you say positively, in answer to that question, that the changes had been made first in the inventory and then in the ledger? Wasn't that question repeated to you several times?
A. "I think it was, Mr. Beale.
Q. "And did you not invariably answer that the changes were first made in the inventory?
A. "I cannot state positively, but I thought at the time that it might have been.
Q. "At the time you were talking to us you thought that the changes had been made first in the inventory?
A. "Yes, sir.
Q. "And you admit, then, that you did tell us that?
A. "Yes, sir.
Q. "For the reason you thought they had been changed there first?
A. "Yes, sir."

It is not necessary to review the testimony of this witness further. It suffices to say

that on reading his whole testimony an impartial mind is at once impressed with the fact that he and he alone was responsible for the condition in which the adjusters found the plaintiff's books. It was his clumsy, negligent, and faulty method of correcting errors in the books and inventory which had been called to his attention by the plaintiff that gave rise to the suspicion on the part of the adjusters and which brought about the unjustifiable charge against the plaintiff.

We say unjustifiable charge for the obvious reason that the record, outside of and beyond the work of the bookkeeper in making the changes in the manner he did, furnishes no evidence of any intent and purpose on the part of the plaintiff to conceal any fact or to have his books to represent anything but a true statement of the condition of his business. And certainly there is no evidence on which to base the claim that the plaintiff intended to defraud the government.

That the plaintiff had discovered errors in the taking of the inventory which showed less stock on hand than was entered on the inventory is established beyond doubt. That he asked his bookkeeper to make the necessary corrections is equally established. That he did not instruct the bookkeeper how to make the corrections or entries on the books or to deduct a lump or an arbitrary sum from the inventory and in the books we have no doubt.

[2] Much was said in argument and on brief about the failure of the plaintiff to produce his memorandum book showing the errors. And numerous authorities are cited as to the presumption against the person who, having evidence in his possession, fails or refuses to produce it.

The authorities cited have no application to the facts of this case. Such a book was in existence, it is true, but it was a private pocket memorandum book kept by the plain-

tiff for the purpose of noting the errors he had discovered in the taking of stock. It formed no part of the system of books kept in connection with plaintiff's business, and was not such a book as was required to be submitted to the adjusters. Moreover, the book had been examined by the accountant Gordon, and all the facts contained in said book were in evidence. The entries in the book itself therefore could not have added to or detracted from the evidence given as to its contents. No presumption can arise against the plaintiff from the nonproduction of the book under the circumstances.

The conclusion is inescapable from the testimony in the record that the defendants have utterly failed to establish with that degree of certainty required by law the charge that the plaintiff has deliberately and willfully attempted to change his books and his inventory with a view to defraud the government or any one else.

[3] The charge of fraud is a most serious one, and the maxim of law is that fraud is never to be imputed to any one except upon legal and convincing evidence. If fraud is to be presumed from such changes and erasures upon the books, as those which appear in this case and which were clearly the work of the bookkeeper, as was the case here, and if forfeiture of policies is to be decreed on such a showing, then scarcely any policy holder would escape the charge of fraud and the penalty of forfeiture.

[4] "Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other." C. C. art. 1847.

"Fraud, like every other allegation, must be proved by him who alleges it. * * * The maxim that fraud is not to be presumed, means no more than that it is not to be im-

puted without legal evidence." C. C. art. 1848.

The character of a policy holder cannot be blasted and his policy declared forfeited, for which a premium has been paid, simply because erasures and changes and substitutions appear upon his books and inventory, made by an incompetent, careless, and thoughtless bookkeeper, especially when such changes are admittedly not material to the loss and do not affect the rights of the insurer.

Having reached the conclusion that the charge of fraud against the plaintiff has not been established, it becomes unnecessary to consider the authorities cited and discussed in the briefs to the effect that, where fraud is established, it is immaterial whether such fraud was intended to affect the insurance companies or some one else. Our opinion on that question will be reserved.

[5] The second ground of defense—that of false swearing—finds no greater support in the evidence than the charge of fraud and concealment. The charge grows out of the testimony given by the plaintiff at the investigation held by the insurance adjusters on December 27, 1919, three months after the fire.

There are 27 typewritten pages of the plaintiff's testimony taken at said hearing, and, the allegation in the answer being general and covering every phase of the alleged changes, erasures, and substitutions in plaintiff's books and inventory, it is difficult to say precisely just what part of the testimony is to be deemed false and untrue. The particular complaint, however, as gathered from counsel's brief, appears to be that the plaintiff on the occasion testified in effect that he knew nothing about the erasures and changes in the ledger and inventory, "that his whole attitude thereon was one of vagueness and uncertainty," whereas on the trial of the case in the court below, two years later, the plaintiff testified that he knew all about the changes.

We have very carefully studied the testimony of plaintiff taken on both occasions, and, while it must be admitted that some statements made by him at the investigation are not entirely free from an adverse criticism, we are not prepared to say, considering his testimony as a whole, that the plaintiff deliberately and knowingly swore falsely with the purpose of misleading the insurance companies, or with a view to concealing any facts bearing upon the subject of inquiry, or of evading any responsibility on his part as a result of the changes and erasures appearing in his books.

The plaintiff made a very poor witness in his own behalf, but his entire evidence plainly disclosed a willingness on his part to give to his inquirers the benefit of any facts within his knowledge in connection with his loss and the changes made in his books and on the inventory. That he was not at that time entirely cognizant of the manner in which his bookkeeper had made the corrections in his books plainly appears from his whole evidence. He knew, of course, and so testified, that changes had been made to correct certain errors which he had called to the attention of his bookkeeper, but where and how such changes had been carried in the books he was not prepared to say, and this was not at all unreasonable, for he himself was not a bookkeeper, and perhaps was not as familiar with his books as he should have been.

The contention that the plaintiff assumed an attitude of entire ignorance of the changes and erasures in his books is not borne out by an examination of his entire evidence given at the investigation. At the time of the trial the plaintiff had full opportunity carefully to go over his books and to refresh his memory. The mere fact that he was then able to give more information and to go more into detail in reference to the errors and their correction furnishes no good reason for saying that his failure to give such explanation on the first investigation constituted false swearing within the meaning of the policy.

[6] Whatever may be the discrepancy between the testimony of the plaintiff under oath on the investigation and that given on the trial, it is very clear that such discrepancy was not upon any material facts in connection with the subject of insurance, and is not sufficient to establish a purpose on the plaintiff's part knowingly and fraudulently to deceive the defendants. In the case of Dunn et al. v. Springfield Ins. Co., 109 La. 525, 33 So. 585, it was said:

"The assured may have sworn to what he believes to be true, but which nevertheless is false, and his policy would not thereby be forfeited. To work such forfeiture, the assured must knowingly and intentionally, and therefore fraudulently, have sworn with the intent to deceive the insurer and get from him a value falsely put upon the property."

In the body of the opinion (Baillie v. Assurance Co., 49 La. Ann. 662, 21 So. 736, 737), the court said:

"The proposition that willful swearing, with a view of deceiving the assured, will defeat the right of recovery, does not admit of any question. It must be made evident, however, that the alleged false swearing was intentionally committed. * * *

"Fraud is never to be presumed from acts which may be accounted for on the basis of honesty and good faith.

"To avoid the policy, it must appear that the intention was to defraud."

In a very elaborate and interesting note to the case of Alfred Hiller Co. v. Insurance Co. of North America, 125 La. 938, 52 So. 104, 32 L. R. A. (N. S.) 453, a case which was decided by this court, under the heading, "Effect of False Swearing in Proofs of Loss," it is said:

"Most policies of fire insurance contain a provision similar to the one set forth in the above case, avoiding the policy if the insured be guilty of false swearing touching any matter relating to the insurance. The question

often arises whether or not this provision is to be strictly and literally applied so as to prevent recovery whenever false statements are sworn to in the proofs of loss, regardless of the circumstances under which the same were made. It may be laid down as a general rule of law, supported by the overwhelming weight of authority, that, in order to make the false swearing in the proofs of loss have this effect, the assured must have made them knowingly and willfully, with an intent to deceive the insurer, concerning some matter material to the insurance."

The author of the note states, on page 458, that the necessity of this element of materiality is questioned in none of the authorities, and is specially declared in the cases which he refers to.

The principle enunciated has been adopted and uniformly followed in this state. Balestracci v. Fireman's Ins. Co., 34 La. Ann. 844; Daul v. Fireman's Ins. Co., 35 La. Ann. 98; Erman v. Sun Mut. Ins. Co., 35 La. Ann. 1095; Baillie v. Western Assurance Co., 49 La. Ann. 662, 21 So. 736; Dunn v. Springfield Ins. Co., 109 La. 525, 33 So. 585.

[7] In the instant case the most that can be charged against the plaintiff—in fact, the most that is charged against him—is that he did not give to the insurance companies a satisfactory explanation of the changes which had been made in his books when he was called upon to do so at the first investigation, and that his testimony on the trial showed that he knew all about the changes at the time he gave his first testimony. If this were true—and we do not think the evidence sustains the proposition—there is nothing to warrant the conclusion that the plaintiff knowingly and willfully intended to deceive the insurance companies as to the fact of the changes or as to the purpose for which such corrections were made, and certainly no one, in the light of the record, would contend for a moment that the matter was a material element concerning the insurance or that it affected the rights of the insurance companies.

Whether the changes were or were not made, whether they were true or false, the fact remains that the plaintiff's loss was far in excess of the total insurance.

[8] The trial judge, who saw and heard the plaintiff testify, and who no doubt knew him personally, did not believe the charges laid against him, and this court, without the advantages which the trial judge possessed, cannot be in a better position to determine the issue of fact than he was. There is certainly no manifest error in his conclusion.

The judgment appealed from is affirmed, with costs.