### ANGICHIODO v. CERAMI et al.
No. 107.

District Court, W. D. Louisiana, Alexandria Division.

Oct. 21, 1940.

Philo Coco, of Marksville, La., for plaintiff.

Couvillon & Couvillon, of Marksville, La., for defendant Sam Cerami.

McCoy & King, of Lake Charles, La., for defendant Amerada Petroleum Corporation.

PORTERIE, District Judge.

This is a suit by Guisseppe (Joe) Angichiodo of California against Sam Cerami of Avoyelles parish, Louisiana, to be decreed title owner in fee of eighty acres of land situated near the town of Bunkie in Avoyelles parish, and to have canceled from the records of Avoyelles parish certain acts purporting to affect his title to the eighty acres.

Plaintiff also makes Amerada Petroleum Corporation, a holder of mineral rights in said property, a defendant, alleging that it is holding its mineral rights under a void title.

Plaintiff acquired this property from Thad Moore and others on December 11, 1918, by vendor's lien deed; Mrs. Angelo Oddo, mother of defendant Sam Cerami and mother-in-law of plaintiff, acquired the vendor's lien, foreclosed, and purchased the property at sheriff's sale on March 30, 1926 (it is admitted by plaintiff that this was a valid acquisition.)

Plaintiff claims title to the property by virtue of an act of sale from Mrs. Oddo to his wife, Rosaria Cerami Angichiodo, dated October 28, 1927, made during the existence of the community, and allegedly paid for with community funds. It is alleged that his wife, seven years later, on October 18, 1934, without his knowledge, consent or authorization, executed a purported reconveyance of said property to Mrs. Oddo for an alleged consideration of $500 cash, which was never paid. He claims that as head and master of the community, he alone could legally sell or convey said property, and for that reason the sale was null and void and effected no divestiture of title in the community.

On June 30, 1935, Mrs. Oddo died in the town of Cheneyville, Rapides parish, leaving plaintiff's wife, Rosaria, and the defendant, Sam Cerami, as her sole heirs.

Plaintiff alleges further that Sam Cerami, with intent to deprive plaintiff of his prop-

erty, by the use of false and fraudulent representations, induced him to sign an act of partition, on July 1, 1935, wherein the eighty-acre tract in question was allotted to defendant; that following the signing of this act, defendant again, by the use of false and fraudulent representations made to plaintiff, induced him to sign a second act of partition on August 21, 1935, wherein said property was mentioned as belonging to the succession of Mrs. Oddo and in which defendant was again allotted the property.

The so-called act of partition of July 1, 1935, two days after Mrs. Oddo's death, was in reality two acts of sale between the brother and sister, one by Sam to Rosaria, the other by Rosaria to Sam. Each sold to the other his or her undivided one-half of the succession of the mother. In each of the two sales Rosaria was joined by her husband, who signed, and the following extract was a part of each sale: " * * * this being land owned by Angelo Oddo, of Cheneyville, La., who is now deceased, and these two parties vendor and vendee being her only heirs, this deed is made for the purpose of dividing property." The instruments are signed by "Jos. Angichiodo, his mark," underneath the statement "I authorize my wife to sign."

Some time thereafter, Sam, upon going to his bank to make a loan and offering as security a mortgage on the tract of land allocated to him by the two sales above, was told that the succession of the mother should be opened, the two heirs placed in possession, to be followed by an act of partition. Upon the joint petition of Rosaria and Sam, this was done and at this second partition, by more formal procedure, the husband of Rosaria, the plaintiff in this suit, again appeared and joined his wife by signing and, this time, the following paragraph forms a part of the authentic act: "And to these presents also came and appeared Joseph Angichiodo, husband of Mrs. Rosaria Cerami, one of the appearers hereto, appearing herein for the purpose of aiding and assisting his said wife in said partition, and for the purpose of assenting to said partition and division in all of its parts, particulars, conditions, *without any reservation, interest or claim on his part.*" (Italics supplied.)

Plaintiff prays that the act of sale from Rosaria to Mrs. Oddo and the two acts of partition be declared null and void and of no effect.

Plaintiff makes the Amerada Petroleum Corporation, holder of a mineral oil and gas lease on said property, a defendant, on the ground that Amerada Petroleum Corporation secured its lease by assignment, through its agent, P. N. Wiggins, from William Helis, on November 30, 1935. Plaintiff alleges that Helis, original lessee, obtained his lease on December 31, 1934, from Mrs. Oddo, who had no title to said property on the date lease was made.

Defendants, Sam Cerami and Amerada Petroleum Corporation, deny the allegations of plaintiff's petition, claiming there was no fraud or misrepresentation inducing plaintiff to act in error of his rights. The two defendants rely on the good faith and the solemn legality of the acts attacked by plaintiff. Alternative relief is sought by alleging that the sale from Rosaria to Mrs. Oddo was in fact a valid reconveyance, confirmed by various acts and deeds of plaintiff.

Amerada Petroleum Corporation further defends on the ground that it is an innocent third party as purchaser of said lease, having relied on the records of Avoyelles parish for its title, and without knowledge of any equities between plaintiff and defendant Cerami. The corporation defends itself, moreover, on the ground that the rights of plaintiff, if any he ever had, were waived, set aside, or conveyed, by his appearances in the two acts of partition.

Plaintiff has pivoted his case on two main points, to-wit:

(a) Was sale from Mrs. Oddo to Rosaria, her daughter, a conveyance of property which inured to the community of acquêts and gains existing between the plaintiff and his wife, Rosaria Cerami Angichiodo?"

(b) "Was sale which followed then from the daughter back to her mother a valid conveyance of title without plaintiff, as husband of vendor, joining in and signing the sale?"

There are additional points made by the plaintiff to follow the above two main pivotal questions, but dependent in their application and legal significance upon the answer given to the above two questions. These will be considered later in the opinion, after the first two questions are decided.

We answer question (a) in the affirmative; Articles 2334 and 2402, Civil Code of Louisiana. Evidence was that the wife had no paraphernal funds, no separate

earnings, and was not separated either in person or property from her husband.

We answer question (b) in the affirmative, because there was repeated ratification by plaintiff of the sale by his wife to her mother. The strength of this ratification, insofar as third parties acquiring after recordation of the ratification be concerned, is fully set out in the first consideration of this case, found in D.C., 28 F. Supp. 720.

The crux of this decision is to determine if this same ratification be effective as between the original parties; and if there are any equities between the parties; and, particularly, if there are any equities in favor of the plaintiff.

The court is fully convinced that the original cash payment of $1,000, moving from the plaintiff to Thad Moore in 1918 as part payment for this eighty-acre tract, when this tract gets into our case picture, was furnished by Mrs. Oddo. The truth is, she let Joe have, at least, $1,250—$1,000 of which moved from Joe to Moore.

That there may be no question on this point, we look to the record. Joe himself said he gave $1,000 cash and executed a note of $1,250 to Mr. Thad Moore for the balance of the purchase price; he denies, however, having received $1,500, or any part thereof, at the Citizen's Bank from his mother-in-law in the presence of Mr. Mathews, the president, and his brother-in-law, Sam. Again, referring to the $1,250 balance, upon being asked by his own lawyer: "Who took up that note?" he replied: "My mother-in-law. She say no use you pay eight per cent. to bank; I got money; you pay me four per cent. and I hold note." Sam stated categorically, giving place, time and witnesses, that Mrs. Oddo, the mother, let Joe have $1,500 to make the cash payment. Sam stated that twice, on direct and on cross-examination.

Joe, in his attempt to deny the receipt of the money in cash from his mother-in-law at the time of purchase from Thad Moore, in the opinion of the court, failed miserably.

The uncontroverted evidence is that Mrs. Oddo, the mother, paid all that was ever paid on the eighty-acre tract of land; she furnished to Joe the cash for the down payment; then, later, she bought the mortgage notes that had been issued for the credit part of the price.

In 1926 Mrs. Oddo foreclosed on the mortgage and purchased the property at sheriff's sale. In the same year Joe, having become involved financially, went into bankruptcy. In the following year, on October 28, 1927, Mrs. Oddo conveyed the eighty-acre tract to her daughter, Rosaria, for a recited consideration of $250 cash and deferred notes aggregating $937.86.

Plaintiff and defendant are agreed that the town lot in Cheneyville forming a part of the succession of Mrs. Oddo, which lot she had acquired on October 28, 1927, from Damiano Dino, meant a payment to her of $1,000 by Joe as of that date (the same date as sale of eighty-acre tract by Mrs. Oddo to Rosaria—thus denoting a general settlement among them of that date). The documentary record is that this lot, which subsequently became two lots when the paved highway was put through, was originally owned by Joe; that in the year 1923 he borrowed money from Damiano Dino, giving a mortgage; that Dino, in the early part of 1926, foreclosed on this mortgage and acquired title to the lot at sheriff's sale, It is to be noted that this was done just ahead of Joe's bankruptcy. After the storm of bankruptcy had passed, Damiano Dino conveyed to Mrs. Oddo the lot, one acre in size, subsequently forming two lots, for the sum of $1,000. We are not here to inquire whether this consideration moved between Dino and Mrs. Oddo, but the court must accept the mutually-agreed-upon fact that this meant, in truth, that Mrs. Oddo received $1,000 from Joe.

Where the plaintiff and defendant disagree very strongly is on the question as to whether this $1,000 is to be credited on the $1,250 advanced by Mrs. Oddo for the cash payment by Joe on the eighty-acre tract, or whether the $1,000 is to be credited on the $1,250 mortgage note bearing on the eighty-acre tract which she was compelled to purchase. Joe testified that the cash of $1,250 at the bank was never received by him, or that, in his rather unintelligible voice and manner, the cash of $1,250, if received by him, had been paid from other sources or in other ways. No proof of the latter claim is offered in any manner. The conclusion by the court as to this $1,000 is shown by the credit and debit balance made a part of this opinion.

In other words, Joe received from his mother-in-law, as previously stated herein,

the whole amount that it took to purchase the property from Thad Moore, as follows:

In cash, at bank................ $1,250.00
By note to Thad Moore, which his mother-in-law had to acquire to protect herself....... 1,250.00

Total ................... $2,500.00

Of this, Joe made some payments that reduced the amount to $2,187.86, so that when Rosaria bought from Mrs. Oddo, the settlement was made using the above figures and the notes executed by Rosaria, as follows:

Paid in Cheneyville property.... $1,000.00
Paid in cash.................. 250.00
Notes signed by Rosaria........ 937.86

Total ................... $2,187.86

The court does not believe the testimony of Joe when he mumbles that the Cheneyville property, valued at $1,000, was in full return for the money the mother had to pay Thad Moore for the mortgage notes representing the unpaid purchase price. If we were to accept his version, how could the nine notes of $937.86 be explained?

On October 18, 1934, Rosaria reconveyed the tract to Mrs. Oddo for a stated consideration of $500 cash. At that time she was given back the set of notes, aggregating $937.86, which she had given to her mother. After the mother's death, in 1935, this set of notes was taken by Joe himself out of the trunk at Mrs. Oddo's home and given to Sam so that the latter might have them canceled at the parish seat, Marksville. It is mutually admitted that they were canceled. This act of Joe is an active physical ratification of that which he placed in writing, of his own free will and accord, in the authentic act of partition between Sam and Rosaria.

Joe pretends that he knew nothing about the notes his wife signed, payable to his mother-in-law, but how can he explain the fact that he himself later was the one who delivered the notes for cancellation at the time of settlement of the succession? The notes are present in this case; they show their cancellation in the mortgage records at Marksville, Louisiana; it is testified by Sam that the notes were given to him by Joe. Joe had had them in his possession, no doubt, since the reconveyance of the property. He protested vehemently that he

knew nothing about the notes, even on the day of the trial. We cannot believe him.

The evidence tends to show that Joe was receiving all the time, enriching himself at the expense of everyone, and paying no one; and, after his bankruptcy in 1926, he was never in funds. He always culminates his testimony, however, with the complaint of having been grossly abused.

Joe was a great beneficiary of his mother-in-law when we consider that Mrs. Oddo was not so very rich. She let him have $1,500 so that he could meet the cash payment required by Thad Moore on the eighty-acre tract. It is after this then that he sank into a quagmire of debt and had to resort to bankruptcy.

After his bankruptcy, when he moved from Bunkie to Cheneyville, he admits that his mother-in-law furnished him $500, required by Damiano Dino before the latter would allow Joe and Rosaria to occupy a tract of land there—land which Joe had formerly owned and on which Dino held a heavy mortgage. Joe claims he protested against his wife accepting the money, but nevertheless it was received by him and he moved on the property. It might well be surmised that other amounts were received by Joe from his mother-in-law, through the intercession of Rosaria, to keep Joe from finally going into bankruptcy.

Nowhere in the record does there appear any money moving from him to his mother-in-law except the $250, when she conveyed the eighty-acre tract to her daughter, Rosaria. Even the fact of this payment in cash is much doubted by the court. Joe says that he gave to his wife three or four hundred dollars, out of which she took $250 to give to her mother. This was immediately after he had gone through bankruptcy. Parenthetically, Joe's bankruptcy showed only $255 of assets, being mainly household goods and farm animals, as against $5,000 of debt.

As an indication that Joe, with his wisdom for grasping and never paying, was fully aware of the transactions between his mother-in-law and his wife, and, from a practical viewpoint, ratified everything, we find his statements, under examination by his own lawyer, to be that he let his wife buy (or receive) the property from Mrs. Oddo so that "when I go into bankrupt it be in my wife's name or I would lose altogether. I would have some property left, so she been take property so my wife she don't lose." Joe is talking like this in 1927; he

has just had experience in bankruptcy, having been discharged in 1926.

Again, to show that nothing transpired without Joe knowing of it and agreeing thereto, Mr. Nick Parrino, who has lived in Cheneyville in the immediate neighborhood of the members of this family for many years, in connection with the very sale by Rosaria back to her mother on which Joe predicates his case as plaintiff, says that Joe came to him with notice of taxes due from the sheriff's office in Avoyelles; that Joe said he was without funds, all he had was $19.30 as balance from the sale of crop; that Joe requested him to interview Mrs. Oddo, though he told Joe it was more Joe's duty to do so; that Joe said Mrs. Oddo might fuss since he could not even pay the taxes overdue, much less the mortgage notes due her on the property; that he, Parrino, went; and though Mrs. Oddo "was get up in air first," she soon became pacified and was made to realize that she would have to buy the property anyway at sheriff's tax sale to protect her notes—and so it followed that Joe's wife returned the property for the unpaid vendor's notes.

It was brought out by the court through questioning of Mr. Parrino that Mrs. Oddo was mentally alert in her old age, arriving at her own business conclusions.

The court is impressed with the fairness and honesty of the settlement of the succession of Mrs. Oddo by and between Sam and Rosaria, the son and daughter. The presence of Damiano Dino, sometimes called Charles Rox, a close friend of the family, at the old lady's home a short time after the funeral, who served as friend and as counsel to the two children, is distinctly Italian. They located some money in the trunk, $636.02. Dino kept this and attended to all funeral costs; and the remainder of this money was divided between the two children. Rosaria, the daughter, still owed $500 to her mother—the sum paid by her mother to Dino for the consideration of Joe and Rosaria living a number of years on Dino's property. Rosaria took the two lots in Cheneyville and the cancellation of the debt of $500 as her share, and the eighty acres went to Sam. No intimation is made that this division at the time was unfair and that the shares were not equal in value.

The court is well impressed with the testimony of the notary who acted as such several times in the relations of the parties.

He is seventy-two years old, has been a resident in the town of Cheneyville for a quarter of a century, and knows all the parties well. The honesty and reputation of Mr. Parrott have never been questioned.

He was the notary who acted in the deed from the mother to the daughter, and again the notary when the daughter reconveyed to the mother, and as to this latter sale testified that the consideration for the return of the property was the unpaid vendor's notes. The cash amount of $500 recited in the deed was only a substitute or a generalization for the notes. The court holds, therefore, that the sale from Rosaria, the daughter, to Mrs. Oddo, the mother, was a reconveyance by the buyer of the unpaid property to the original vendor.

Mr. Parrott states that he furnished the idea of the mutual sales between Sam and Rosaria, that is, "just deed over to each other their undivided interest in the properties, and divide the succession that way." This arrangement, of course, was subsequently replaced, upon the joint petition of the two children, by the regular opening of the succession of Mrs. Oddo in Rapides parish, but the act of partition following the placing of the two heirs in possession was also passed before Mr. Parrott.

As to the first partition, or mutual sales, Joe, though never having made it a direct point in his petition, testified about "a will," as follows:

"Q. After she died, did you and Sam Cerami and your wife meet in Mr. Parrott's office to sign any papers? A. First my wife went and Mr. Sam Cerami went to Mr. Parrott's and leave me at home, which I know nothing about them going over there. After Damiano Dino signed Mr. Parrott send out and send for me. He say, 'Why Joe no be here?' He say, 'Joe got to sign.' Mr. Sam Cerami send for me, send his son with truck after me. I went over and asked Mr. Parrott, 'What you want?' He say, 'You have to sign your mother-in-law will.' I say, 'What you mean? Mother-in-law dead. I no ever hear anybody make will after dead.' He say, 'This be no good or anything else unless you sign. If you sign she be good.' So I say, 'I no know what to do.' He say, 'Touch pen.' That is all.

"Q. Did they tell you what you were signing? A. All I know was will. What she mean I no know. That is all I can tell. I can no tell what she mean."

Mr. Parrott's evidence on the occurrence is that no will was drawn or signed and, in fact, nothing was ever said by him about a will.

All of the points about different ink being used in the deeds and some insertion apparently by a different typewriter are explained satisfactorily by the notary.

Apparently Joe is unsatisfied at the time of the mother-in-law's death, though he received during her lifetime money continuously and repeatedly, as he shows when he says: "Old man Cerami (father of Sam and Rosaria), he had store, and he had lot places, and he dead and leave money to mamma and Mr. Nick (Parrino) come up and we look after it. We went back to see if to find these money, you understand? I get mad for my mother-in-law, because I think she got money and no can find for her. We find these money back in trunk of some place else. We find these money, but we can no find the other money." Again he says: "No sir, money he find I no can find. He say find five or six hundred dollar. That was on trunk. That was money find in house. Other money, six or seven hundred dollar, we can no find. Mr. Nick he say that money on bank or post office and we no can never find that money. We never find that."

"Q. There was six hundred dollars found at the house? A. Yes; Damiano Dino get that.

"Q. That paid the funeral expense? A. Yes.

"Q. And you got one-half of the balance, or your wife? A. I don't know what get wrong. I never get bit of it."

Pete Bruno, sixty-three years of age, acquainted with all the parties in this case for a generation and one of the few now living of the several present at the old home after the funeral, testified in the case relative to the mutual sales of Rosaria and Sam. He was not present at Mrs. Oddo's house after the funeral, but he was present at Mr. Parrott's office. A witness for the plaintiff, he corroborates substantially what the others have to say. Main evidential highlights of his testimony are (1) that Damiano Dino was present and explained fully in Italian to the parties the contents of the documents and (2) that Joe willingly touched the pen and (3) that he, Dino, was given the act of partition to bring to Rapides parish courthouse for recordation.

The court is constrained, therefore, as aforestated, to answer question (b) in the affirmative; that is, the want of the signature of the husband, so sacramentally required by Civil Code Article 2404, is supplied later by the double ratification of the husband. The husband appears as a party in subsequent authentic deeds. These subsequent authentic deeds are of the same dignity as the authentic deed in which plaintiff claims he should have joined with his wife.

Having answered main questions (a) and (b), we now reach the auxiliary questions of law presented by plaintiff.

(c) "Were acts of sale (admittedly first act of partition) sufficient to transfer title to Sam Cerami and did plaintiff know their import, even if he signed, to authorize and assist his wife; were they signed in error induced by false representation; regardless of fraud, are the acts translative of property?"

■ From the evidence fully set out hereinabove, we say that plaintiff signed, knew the import of the documents he signed, and that which he signed was read to him by the notary or the lawyer, and was explained to him by Damiano Dino, the mutual friend of the two children. This was a ratification of the act of sale by his wife to his mother-in-law. We are unable, after exercising our best effort, to see any error by the plaintiff or that he was induced by false representations.

■■ The latter part of the query is "regardless of fraud, is act translative of property?" Each act of sale had these words: "this being land owned by Angelo Oddo, of Cheneyville, La., who is now deceased, and these two parties vendor and vendee being her only heirs, this deed is made for the purpose of dividing property." Joe, at the end of these authentic acts, right under his wife's signature, signed after the words "I authorize my wife to sign." As far as Joe be concerned, it is translative of whatever title he might have. By signing he thus acceded to the fact of his wife's inheritance from her mother, by implication recognizing title in the mother. Granted that the undivided title was in his wife, he then joined, as her husband, in the division with her co-owner, Sam Cerami. This, certainly, was a full compliance with Louisiana Civil Code, Article 2404.

These two documents could well be ignored entirely as far as the final decision be concerned. The document controlling this case is the act of partition following the opening of the succession, to be next

discussed. The parties entered the second partition to replace the first, anyway.

We now take auxiliary legal question (d) made by plaintiff: "Was second act of partition between Rosaria Cerami Angichiodo and Sam Cerami signed before a notary and two witnesses, and was it in fact signed by plaintiff at all; was the act read and explained to plaintiff, and if so, were any misrepresentations made to induce plaintiff's signature thereto; was act translative of title?"

We cannot give any favorable turn to the plaintiff on this question either. This act of partition followed the judgment placing the heirs in possession; it was before a notary and two witnesses. Joe is proved to have been present; the result of the act of partition was fair; of all persons, Joe knew that it was more than fair as far as he was concerned. The notary says the act was read by himself or the lawyer present. From the evidence, there were Italian friends who explained the document to Joe. The court can see no misrepresentations possible.

On the legal point made that regardless of fraud, is the act translative of property, our answer is that the act is before a notary public, witnessed by two persons, and is, under the Civil law of Louisiana, an authentic act. Articles 2440 and 2234, Louisiana Civil Code. The cases cited in plaintiff's brief to the effect that a partition is merely declaratory and not translative of ownership are (in greater number) cases arising on the point of whether or not a partition may serve as the basis of prescription. The prescription of obligations by time is not favored. The Codal requirements for effectiveness of prescription are to be strictly construed.

The requisite of the Codal article that the husband should join in the sale of community property to make the deed valid is one, in the opinion of the court, subject to ratification, especially when the ratification is embodied in an authentic act as in the instant case.

We find a compliance with the Louisiana Code article previously cited. The important legal fact is that the husband joins in an authentic act. The fact that the authentic act happens to be one of partition between the other two parties of real estate does not render ineffectual the signature of and does not diminish the authority given by the husband.

So, in the act of partition where the language "And to these presents also came and appeared Joseph Angichiodo, husband of Mrs. Rosaria Cerami, one of the appearers hereto, appearing herein for the purpose of aiding and assisting his said wife in said partition, and for the purpose of assenting to said partition and division in all of its parts, particulars and conditions, without any reservation, interest or claim on his part" is found, the husband there is an appearer, individually, and conveys title, if any he ever had. It is a full authentic act by him individually and, also, in his character as husband, both declarative in force and translative in effect. The partition as between Sam and Rosaria may be but declaratory, but as between Joe and the world it is translative.

Consideration need not be monetary. In this case it might well have been the knowledge that in truth and justice he owned nothing. He knew the land had gone to his wife's name to prevent the land from becoming mixed with other persons' future claims against him. He had just rid himself of debt through a bankruptcy proceeding. He knew also that no money had been paid on the price; or that, if the $250 cash had been paid, he had had the use of the property long enough, 1927 to 1934, without any payment (the nine notes show none) on the credit part of the price, so that the cash payment at date of purchase of $250 had been more than exhausted in that manner. Any of this is sufficient and valid consideration.

The cases cited in plaintiff's brief on this point, excluding those where the point was the basis for prescription, show facts not similar to the instant case. The cases show large payments that subsequent use of the property could not indemnify.

And, finally, no case is shown where an appearance and declaration such as are found here existed. The plaintiff cannot revoke his own alienations, made in such forceful and legal form.

For instance, in the case of W. G. Wilmot & Company v. Steamer Ouachita Belle, 32 La.Ann. 607, cited by plaintiff, it is said: "It operated merely as a conventional reconveyance of the property, binding the parties thereto according to the terms of their stipulations, but not obliterating the antecedent ownership of the purchasers during the interval between the sale and retrocession, nor affecting privileges acquired under said ownership." Granted;

but the appearance and declaration by the husband later by authentic act revoked and made dead whatever privileges he, as husband, acquired under the ownership of his wife. So it is with all the cases submitted by plaintiff. The husband's appearance defeats and sets aside all that which he might have owned under their very principles.

We admit that under Article 2404 of the Louisiana Civil Code and the many cases cited, "a wife cannot alienate property belonging to the community of acquêts and gains without authority and consent of her husband who is head and master of community" (Vanzant v. Morgan, La.App., 181 So. 660, 661). But, in this case, the head and master of the community by later authentic act has given his authority.

We now reach auxiliary question (e) made by plaintiff: "Did any subsequent acts of plaintiff amount to ratification or confirmation sufficient in law to validate or vitalize title in defendant?"

We answer the above question in the affirmative. Why? Because both parties acted according to the terms of the partition. Sam Cerami took possession of the eighty acres, has lived on it since, has built an $1,800 residence thereon, had it assessed to his name and has paid taxes accordingly. In the same manner, Rosaria was given a receipt for the $500 she owed her mother; she exercised ownership and possession of the two lots at Cheneyville, having rented them and collected the rents and paid taxes ever since. It is admitted here of record "that the Cheneyville property which has heretofore been the subject of testimony here and acquired in the partition of the succession of Mrs. Oddo has never been disposed of by Mrs. Rosaria Angichiodo during her lifetime."

The opinion of this court, as previously given in Angichiodo v. Cerami et al., 28 F.Supp. 720, is quite applicable, though not fully, in the instant case. The new question is whether there was fraud perpetrated on the plaintiff when he joined in and signed, as husband and individually, the authentic acts. In the previous case where we were dealing with third parties who had dealt upon the face of the record in good faith, we held these third parties to be free of any of the hidden equities or of any fraud that might have existed between the original parties.

In making our conclusions in this case, we have analyzed and have been influenced by the following allegations relative to

fraud in plaintiff's petition. In Article 9, he alleges "* * * that defendant Sam Cerami, with fraudulent intent to deprive your petitioner of said property, stated to him that the herein mentioned act of sale was in truth and in fact only a procedure in the settlement of the succession, and that he, your petitioner, would not lose any of his rights and title in and to said property if he joined said sale for the purpose of authorizing his said wife in its execution; * * *." And in Article 10, we have "* * * and that it (the signing) would in no way divest your petitioner of his title in and to the above described property." Further, in Article 11, as to the second act, or partition, the misrepresentation of Cerami was alleged to be that "* * * it was necessary for his appearance therein to undo and cancel the purported act of sale mentioned in Paragraph 9 herein to clear petitioner's title to said property."

We said before that we have no belief at all in Joe when he talks at length about having been brought and asked to sign a will. There is nothing in the above allegations to show that Joe knew about a will at the time these allegations were drafted. It is stated too clearly in the above articles, formal judicial declarations, that the plaintiff knew it was an act of sale and not a will. We believe the idea of the will was self-serving and arose later in Joe's mind, after the draft of his petition. That part of Joe's testimony to the effect that he had not signed anything definitely falls, also, because the above petition is too clear in the statement that there were acts of sale, and that he did sign the acts of sale.

With all the facts before us, we should now arrive at our legal measurement of them.

First of all, the allegations of the plaintiff, putting aside the phase of fraud, should be proved by a preponderance of the evidence.

Joe appears repeatedly in acts, signing before a notary and two witnesses in each case. We have already quoted what he signed in the acts of partition. The evidence is that explanation was made to Joe each time, by dependable friends present and serving as witnesses, of the content of these deeds. He had full opportunity to investigate the documents. The sales and documents were repeated. Could it be that fraud was practiced on him that many times? No, the court is convinced he knew full well of the content and significance.

■ Even if the plaintiff did not know what he was signing, or thought he was signing something else, or was misled in signing by someone else, he would not be relieved. Ker v. Evershed, 41 La.Ann. 15, 6 So. 566; Allen, West & Bush v. Whetstone, 35 La.Ann. 846, 850. The Supreme Court of the United States in Upton v. Tribilcock, 91 U.S. 45, 50, 23 L.Ed. 203, said: "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission."

Therefore, plaintiff has no cause of action; no preponderance of the evidence is with him.

■ The success of his case next depends upon his allegations of fraud. The court feels that no fraud has been proved. In the face of three solemn acts, signed by plaintiff before notary public and witnesses, acknowledging defendant's title, and incontrovertible facts showing that plaintiff was fully cognizant of the situation, we are unable to discern any fraud. Fraud is never imputed except on legal and convincing evidence produced by the one alleging it. Strauss v. Ins. Co. of North America, 157 La. 661, 102 So. 861. "The defendant [one alleging fraud] therefore carried the burden of proving, not only that plaintiff made misrepresentations, but also that they were knowingly made with fraudulent intent." Garnier v. Ætna Insurance Co., 181 La. 426, 159 So. 705, 707. Fraud will not be inferred from slight presumptions. He who alleges a fraud must prove fully. It does not suffice that he introduced evidence that rendered it probable. Charrotte v. Louisiana College, 1 La.App. 438.

As previously discussed, both Rosaria and Sam, following the act of partition, went into possession of the property each received. These years of acquiescence by the plaintiff destroy his claim of fraud.

It appears to the court that the spark which brought about the fire of this suit was the visit of Mr. Haas and Mr. Mosley, five years after the partition, who were seeking to get a mineral lease from Sam, and who indicated that Joe should join in the mineral lease. Sam wrote a letter to Mr. and Mrs. Joe in California, followed later by a postal card. Joe then came to Louisiana; the oil field was booming; and this suit followed.

The rule of law as to fraud is even stronger than as yet stated in this opinion. Under the rule announced in Belcher v. Booth, 164 La. 514, 114 So. 116, 118, we find: "We think that fraud should be proven to that degree of certainty which warrants the conviction of a person who is charged with the commission of a crime, i. e., beyond a reasonable doubt." Also, the case of Barlow v. Harrison, 51 La.Ann. 875, 25 So, 378, is support for the statement that the law presumes against fraud; and where acts are susceptible of two constructions, one consistent with honesty and fair dealing, and the other odious and criminal, the burden of proof is on the one who charges the latter and wishes the court to think that the odious and criminal construction represents the true facts.

We find good faith in Sam Cerami. Transactions by him and his wife were always in the open, in the daytime, at the proper places; documents were placed of public record, and disclose no advantage taken by him of his sister.

The court was very liberal in the admission of testimony; in fact, there was practically no restriction, and nothing has emerged to support the allegations of fraud.

We have to decide now between the plaintiff and the Amerada Petroleum Corporation, the other defendant.

The first point advanced by plaintiff is that the Amerada Petroleum Corporation is in the shoes of William Helis, because it could not acquire more than that which Helis, its assignor, had.

Helis secured his oil, gas and mineral lease from Mrs. Oddo, the mother, on December 31, 1934, filed on April 4, 1935; the mother had reacquired from Rosaria on October 18, 1934, filed on January 14, 1935; all of this is previous to the dates of the two acts of partition, to-wit: July 1 and August 21, 1935. Helis then assigned to Wiggins on September 16, 1935, and Wiggins, in turn, assigned to the Amerada on November 30, 1935. The question of law here is whether or not the position of the Amerada Petroleum Corporation was improved by the subsequent acts of partition, wherein the plaintiff appeared and participated.

■ It is a well-settled principle of law in Louisiana that when a sale, lease, mortgage or lien is granted at a time when the vendor is not the owner of the property, after-acquired ownership inures to the benefit of such vendee, lessee, mortgagee or lienee.

■ Under the Civil law of Louisiana, the seller is a warrantor of good title unless special disclaimer be made to the contrary. Article 2501, Louisiana Civil Code, is the applicable article. The case of Wells v. Blackman, 121 La. 394, 46 So. 437, 444, is the leading case on this point, as it rehearses all of the previous jurisprudence and furnishes the definite law for the future. We make a liberal quotation from the case:

"The common-law doctrine applicable to the situation thus presented is stated as follows:

" 'It may be laid down as a general proposition that, where the grantor makes a conveyance, containing any of the usual covenants, of lands to which he has a defective title, or no title whatever, and subsequently acquires title thereto, such after-acquired title will inure to the benefit of the grantee. * * * It is a well-settled principle of the common law that, if one conveys real estate with a covenant of general warranty, he cannot be allowed to set up against his grantee, or those claiming under him, any title subsequently acquired, either by purchase or otherwise, and that such new title will inure, by way of estoppel, to the use and benefit of his grantee, his heirs and his assigns.' A. & E. Enc. of Law (2d Ed.) pp. 403–405.

"And the same rule obtains under the law of this state:

" 'If A. sells property of which he is not the owner, and he afterwards acquires title, that title vests at once in the vendee.' Fenn v. Rils, 9 La. 95; Stokes v. Shackleford, 12 La. 170; Noulen et al. v. Perkins, 3 Rob. 233; Lee v. Ferguson, 5 La.Ann. [532], 533; Barkley v. Succession of Steers et al., 47 La.Ann. 951, 17 So. 438; Benton and Milliken v. Sentell, 50 La.Ann. 869, 24 So. 297; City of New Orleans v. Riddell, 113 La. 1051, 37 So. 966.

"And equally is it true that if A. sells property of which he is the owner, and, it being sold in satisfaction of a debt due by him, he becomes the purchaser, either directly or through mesne conveyance, the title so acquired inures to the benefit of such vendee. The seller is bound to deliver and warrant the thing which he sells. Civ.Code, art. 2477 (2501); Clark v. O'Neal, 13 La.Ann. 381; Jacobs v. Yale and Bowling, 39 La.Ann. 359, 1 So. 822."

■ The answer is definitely that the position of the Amerada Petroleum Corporation was improved by the subsequent acts of partition, wherein the plaintiff appeared and participated. Then, all that has been said as to facts and law in this opinion as between the plaintiff and Sam Cerami becomes applicable in favor of the Amerada Petroleum Corporation.

The examination by the Amerada Petroleum Corporation of the two acts of partition is construed as sufficient examination for it to claim reliance on the records and to place it in the category of an innocent purchaser. It need not have examined and inquired into the title of Angelo Oddo.

This is decidedly so, because the two acts of partition, which remedied any defect in the title of Helis, were of record when Wiggins, the agent of Amerada, was assigned the Helis lease. The clear oral and documentary proof of record is (a) that Wiggins did not purchase from Helis except after examination of the alienation records; (b) that special reliance was placed in the acts of partition, particularly the second one following the succession proceedings. Consequently, Amerada Petroleum Corporation is in the same legal situation as the several defendants in the previously reported case of Angichiodo v. Cerami, D.C., 28 F.Supp. 720, wherein it was held the plaintiff had no cause of action. For the sake of brevity, the full reasoning of the above case is made to apply here by reference. It appears, therefore, that plaintiff has no case against the corporation.

The petition of plaintiff has to be dismissed at his cost, and such a judgment, upon presentation, will be signed.