64 So.2d 850

**ACADIAN PRODUCTION CORP. OF LOUI-SIANA v. McKENDRICK et al.**

No. 40804.

March 23, 1953.

Rehearing Denied April 27, 1953.

See also, 64 So.2d 844.

E. B. Charbonnet, Jr., John T. Charbonnet, New Orleans, for plaintiffs-appellants.

Minos H. Armentor, New Iberia, Felix W. Gaudin, New Orleans, for Chas. S. McKendrick, and others, defendants-appellees.

Samuel J. Tennant, Jr., New Orleans, pro se and for Saro Petroleum Corp., defendants-appellees.

MOISE, Justice.

Our examination of the record in this case convinces us that the trial court has correctly concluded that the law and evidence is in favor of defendants and properly dismissed plaintiff's suit. We, therefore, adopt the trial judge's conclusions as our own and quote approvingly his reasons for judgment:

"Plaintiff seeks to be adjudged the owner of certain fractional interests in a mineral lease it alleges were acquired for its account, with its funds, or with funds raised on its credit, but of which it has been deprived through fraudulent conspiracies among the defendants.

"Plaintiff is a corporation organized for the purpose of engaging in the production of minerals. In January 1940 it acquired what is commonly known as a working interest in a mineral lease on property situated in St. Martin Parish. It is relative to this interest and its operation that this controversy has arisen.

"Specifically the interest is described as:

"The 68¾% of the ⅞ interest in a mineral lease bearing upon a certain tract of land situated in the fourth ward of St. Martin Parish, Louisiana, in Section 118, Township 9 South, Range 5 East, containing thirty-nine (39) arpents, whether it actually comprises more or less, and being bounded on the North by Flat Lake and lands now or formerly owned by Billeaux and Delaureal, Deborrah Oil Co., A. Begnaud and R. Martin; on the East by a public road and/or public right of way and/or lands now or formerly owned by L. D. Bergeron; on the South by Louisiana State Highway No. 43; and on the West by

lands now or formerly owned by E. Breaux; together with all lands owned or claimed by lessor, either legal or equitable, contiguous to the land hereinabove specifically described, whether the same be inside or outside of the surveys, sections, townships or ranges hereinabove described.

"The defendants are Charles S. McKendrick, one of its officers, Samuel J. Tennant, Jr., at one time its attorney, Misses Martha and Loretta McKendrick, the sisters of Charles McKendrick and recipients of a portion of the property sought to be recovered. Miss Loretta McKendrick has died since the institution of this suit. The Saro Petroleum Corporation, allegedly the repository of the Tennant interest, was made defendant in an amended petition.

"Plaintiff charges that John D. and Charles B. Gholson, brothers, were parties to the conspiracy, but they are not made defendants in this action. It was testified that they were partners in all of their activities whether they were carried in their individual names or the partnership name.

"The method of carrying into effect the conspiracies charged consists mainly of the acquisitions of mineral interests by one of the persons mentioned and assignments by him, in whole or in part, to one or more of the others. There are many of these transfers involved, in fact, too many to mention all of them. Reference will therefore be made only to those which are necessary to an intelligent discussion.

"The plaintiff corporation began operating the lease about the year 1940. At that time the Iberia Petroleum Corporation owned the $\frac{7}{8}$ working interest in the lease on the land above described, having acquired it from George Helis. Plaintiff purchased from Iberia Petroleum Corporation $68\frac{3}{4}\%$ of its $\frac{7}{8}$. This land is situated in what is known as the Anse-LaButte Oil Field.

"Drilling oil wells was about the only practical use that plaintiff could make of its acquisition, so it proceeded to drill them. The funds necessary therefor were raised by selling stock of the corporation, selling portions of its interest and assigning oil payments. Some of the wells were productive and some were not. Apparently, its expenses exceeded its revenues, for in the course of a few years it found itself without capital stock to sell, with only a fractional interest left in the lease it has acquired, with many oil payments outstanding, money judgments against it, unpaid bills and in court faced with a suit to have it declared an involuntary bankrupt. Its activities came to practically a standstill.

"During these years the defendant McKendrick had always been active in the affairs of the corporation. The other defendants have never had any official connection with the company.

"Faced with this financial crisis McKendrick attempted to rejuvenate his corporation with funds raised from one E. J. Rovira. Simultaneously with the raising of

the funds, another corporation was formed. Its name is the Moresi Lease Management, Inc. It was formed only for the purpose of operating the property of the plaintiff corporation. It is a non-profit organization and serves somewhat in the capacity of an agent. The venture with Rovira was not fruitful. No improvement in the yield on plaintiff's lease was had until the Gholsons took interest in it. John D. Gholson took the active interest. He took over the management from Rovira and joined McKendrick in guaranteeing the debt to Rovira.

"Since the change, production has increased many times and the interests which were once practically worthless are now valuable. It is contended by the defendants that had not this happened, this litigation would never have originated as the value of the subject matter would not have justified it.

"However this may be, there occurred two principal events in these activities that precipitated this action. The first is the purchase of a judgment against the corporation and the seizure and sale of its last fractional interest in the lease under that judgment. The other is the raising of funds from Rovira upon two chattel mortgages bearing against the corporation's property.

"The judgment had been rendered against the corporation in the amount of $750.00 in favor of Caballero and Roger. There were other judgments of record against the company. The attorney for Caballero & Roger was L. Walter Cockfield. The defendant Tennant negotiated for and purchased the judgment through this attorney for $125.00. A writ of fieri facias was caused to issue in this court and a Sheriff's Sale resulted. At this sale John D. Gholson became the purchaser without competitive bid, that is, he was the only bidder. It became known thereafter that he purchased the property for McKendrick. The mineral interest seized was the 15.6463685% of ⅞ interest in the lease, and was all that Acadian had left out of the 68¾% it originally owned.

"Plaintiff charges that these men, McKendrick, Tennant, and the Gholsons, had confected a conspiracy to defraud it of this property. It classifies Tennant as the attorney of the corporation. Tennant had represented the company in a number of legal matters. One was when its former attorney, John R. Land, Jr., had obtained a judgment against it in the Federal Courts for a considerable portion of its interest in the lease. Tennant, after exerting substantial legal effort, was successful in having the amount of the judgment reduced, thereby saving the corporation the interest which later became the subject of the seizure. Tennant also represented the company successfully in opposing the move to place it into involuntary bankruptcy. But Tennant was primarily McKendrick's attorney. At the time he was employed, the company was in financial difficulty, and

remuneration for his employment was problematical. He claims to have done so only at McKendrick's insistance.

"Tennant was to receive 10% of plaintiff's interest as attorney's fees but McKendrick found it impractical at the time to have the company transfer to Tennant his entire interest. Accordingly, the corporation assigned to Tennant 5.484004%, and McKendrick assigned to him a like amount from his personal interest. McKendrick explains that he intended to have the corporation refund him this interest at a later date. However, the assignment of plaintiff corporation to Tennant of the 5.484004% interest is not at issue in this case and its recovery is not herein, sought.

"In its original petition plaintiff seeks to recover three fractional interests.

"The first of these interests is the 3.-521728% of the ⅞ acquired by Tennant on August 5, 1948. This interest was acquired in 1946 by Charles B. Gholson from John R. Land, Jr. Land had acquired it in the judgment of the Federal Court heretofore mentioned.

"The second interest is the .510263% of ⅞ acquired by Tennant on the same date. John D. Gholson in turn had acquired it from several individuals, referred to by the parties as the Smith, Reder, McCadden and Reisenberg interests.

"The third interest in the 2.824472% of ⅞ now owned by Misses Martha and Loretta McKendrick. It is part of the last mentioned interest, and was deeded to them at McKendrick's request in payment of funds they had advanced to him from time to time.

"None of these interests come to nor has passed through any of the defendants' hands by virtue of the Sheriff's Sale nor were they purchased with the funds that were the proceeds of the loans from Rovira. The evidence is plain that the Gholsons made these purchases with their own money. The attacks made upon the Sheriff's Sale and the Rovira loan do not therefore directly involve these titles.

"The other interest plaintiff claims (by way of an amended petition) is the 5.-484004% of the ⅞ presently in the name of the Saro Petroleum Corporation. Tennant is the president and principal stockholder of that corporation and the transferor of this interest. That interest is the one he received from McKendrick in part payment of his fee for representing the plaintiff corporation as its attorney. As heretofore stated the fact that he amply earned that fee cannot be questioned. Plaintiff attacks it, however, because the interest was purchased by McKendrick with proceeds of the loans made from Rovira.

"It is plaintiff's theory that a conspiracy existed between the defendants to defraud it of its property among which are the mineral interests herein sued for. For the purpose of showing this conspiracy plaintiff has presented evidence concerning practically all of the defendants' activities in

their dealings with this property. Much of the interests about which we heard evidence are not concerned in this action. I presume that plaintiff presented it for the purpose of showing a system of the defendants in the alleged conspiracy.

"Before entering into a further discussion of the issues it should be here stated that the evidence does not disclose a conspiracy to defraud the plaintiff as plaintiff claims. A conspiracy, like any other fact, must be established by a preponderance of the evidence. The defendants each denied that they conspired or that it was their intention to defraud the plaintiff corporation, and when we consider the circumstances and their activities we are bound to conclude that they had not conspired nor did they entertain a concerted intention of defrauding the plaintiff corporation of its property.

"Therefore, the evidence plaintiff presents relative to other transactions, such as the Sheriff's sale and agreements made among the persons named for the division of their interests, becomes of no importance. This is true because this evidence has no direct bearing on the manipulations herein complained of. Having arrived at the conclusion that plaintiff failed to establish a conspiracy, we must, of necessity, discard this evidence.

"The purchase of mineral interests in his own name, with the funds borrowed from Rovira, is the only charge remaining against McKendrick and the persons who now own these interests. It remains the sole attack on the title of the 5.484004% of the ⅞ interest of the Saro Petroleum Corporation we are now considering.

"At the time McKendrick applied to Rovira for funds the corporation was probably at its lowest financial ebb. McKendrick had made personal loans from Rovira on many previous occasions. They formed continuous transactions, as McKendrick seemed to have been continually indebted to Rovira for a number of years.

"For this loan, however, Rovira exacted a high premium. He justified his demands by pointing to the insolvency of plaintiff corporation. By the terms of the negotiations McKendrick was also compelled to become personally liable for the entire debt; that is, he had to personally guarantee payment of the loan made in the name of Acadian. The loans in question are evidenced by certified copies of the two acts of mortgage identified as Exhibits P-101 and P-102. They are the result of the written agreement between the parties evidenced by Exhibits P-100.

"What actually happened is that McKendrick and the corporation made loans from Rovira apparently secured by chattel mortgages on the chattels of the corporation. A total of $25,000.00 was borrowed; $17,500.00 by McKendrick and $7,500.00 by Acadian. In order to get this amount, however, McKendrick was required to execute his note for $7,000.00 more than the money he borrowed, that is, $24,500.00, and Aca-

dian for $3,000.00 more than it borrowed, that is, $10,500.00.

"In addition to that a note of $10,000.00 was given to A. C. McGuirk by McKendrick supposedly for having negotiated the loans.

"The money remained in Rovira's hands and he paid the purchase price of the interests as McKendrick bought them and drew upon him for their purchase price. All of the interests McKendrick purchased were put in his name. These interests and oil payments were those the corporation had sold to finance its activities with the exception of the working interest owned by the Iberia Petroleum Corporation. Iberia's interest was that which it had retained in the lease when it sold plaintiff its 68¾% of ⅞ mentioned.

"With the passage of time these mortgages were liquidated. In the meantime, however, John D. Gholson joined McKendrick in becoming personally responsible for the loans to Rovira.

"As it has finally terminated, the Acadian Production Corporation did not lose any of its property by foreclosure nor has any of its funds actually been used in the purchase of the interests by McKendrick. In other words, it actually contributed nothing financially to the fund which McKendrick used to make his purchases. It may be said that it loaned its credit. And when the mortgages became paid its financial situation was not disturbed by the process.

"However, in its contention plaintiff disregards that the bulk of the funds used by McKendrick to make these purchases were his own, having been raised on a personal loan. It places great emphasis upon the fact that McKendrick's personal loan was secured by a chattel mortgage on the property belonging to the corporation; the chattels being the same offered in both chattel mortgages. Because of this fact plaintiff apparently makes no distinction in the nature of the funds raised by the mortgages. It loses sight of the plain legal principle that one cannot validly mortgage another's property. If the movables belonged to Acadian and McKendrick mortgaged them for his debt, certainly there is no valid security for the loan. The mortgage holder could not have foreclosed on the mortgage and seized the property. Acadian therefore lost nothing.

"There is no legal basis upon which the owner of property, mortgaged by a third person, can claim the proceeds of the loan as its own. It is therefore plain that at least $17,500.00 of the $25,000.00 loan belonged to McKendrick. To follow plaintiff's contention would in effect take away from McKendrick property purchased with his own funds and give it to plaintiff. Certainly this cannot be done.

"Of course, McKendrick attempts to justify himself both legally and morally. He points out that the company owes him considerable sums and because of the judgments outstanding against it anything he

placed in its name would have been immediately consumed by the creditors. Morally, he feels justified in having. had the corporation assist him to make these acquisitions. Whether or not he is correct in this conclusion we are not called upon to decide; we are only concerned with the legal aspect of the transaction.

█ "The legal and equitable doctrine that plaintiff relies upon for the success of its claim requires a much stronger case than that with which we are presented. One cannot enter into a consideration of this doctrine, as completely discussed in the Succession of Onorato, [219 La. 1] 51 So. 2d 804, without at once ascertaining that it is fundamentally based upon the equitable theory that the property purchased by a fiduciary with entrusted funds becomes liable for the repayment of these funds if there are no other means by which reimbursement can be made.

"There our Supreme Court applies it to recognize the claim of the owners of funds that had been embezzled by a fiduciary agent, who subsequently died, from the proceeds of life insurance policies the premiums of which had been paid with the embezzled money; there being insufficient assets in the estate to make restitution. The doctrine is founded in equity.

█ "In our case here the essential fundamental for the operation of the doctrine is lacking. Plaintiff lost no funds; none were embezzled. The proceeds of its mortgage were voluntarily turned over to McKendrick for the specific purpose for which they were used. The elements of embezzlement are lacking.

"The doctrine can be invoked only for the purpose of restoring to the complainant what he has lost. It cannot be used to' effect a gain or to take away from another what he has acquired with his own funds. In this instance plaintiff is not suing, and cannot bring action, to recover for funds wrongfully taken from it, for none were taken. There is therefore no basis for the operation of the doctrine of equitable trust.

"It should be remembered that we are dealing with the activities complained of in retrospect, that is, we are seeing them with the benefit of several years' advantage. What now proves to be a good investment may not have looked so bright at the time it was made.

"The initial step required of McKendrick to embark upon the venture of which plaintiff complains was to become burdened with a debt of $45,000.00. The plaintiff corporation was bankrupt and could give no financial assistance. It is very evident that the lending of its credit to secure $7,500.00 of this amount was only a token of help.

"When the Gholsons became· interested in the venture their first step was to assume personal responsibility for this debt. For a period of approximately ten years ·the development of the property involved

had resulted only in financial losses. It must therefore be clearly recognized that the defendants were proceeding at considerable risk, for no one could foretell what the future would hold. What we now know to have been good investments were gambles when they were made.

"As a convenient method of disbursing their funds the defendants drew upon their credit with the Moresi Lease Management, Inc. Some of the interests they purchased were paid for in this manner. Plaintiff has laid great stress upon this procedure and has placed in evidence many of the records of that company. It is apparent that that method of doing business is one of the main reasons why plaintiff makes the claim of collusion between the defendants.

"Not much significance can be attached to this method of operation, however, as it was shown at the trial that the defendants used their credit with this company much in the same manner as one uses a bank. The revenues from the sale of oil would accumulate to their credit and they would draw upon it as the circumstances made it convenient. This method does not seem to be irregular. Certainly, it does not prove conspiracy.

"There are several other reasons why plaintiff cannot succeed in having this 5.484004% of 7⁄8 interest of the Saro Petroleum Corporation adjudicated to it. One is that when Tennant acquired it in June 1946 and assigned it to the corporation in February 1951, they had a right to depend

upon the public records for their title. These records showed no apparent defect, or that plaintiff claims it. One needs no citation of authority to support the legal proposition that the doctrine of constructive trust does not hold the title to an immovable in suspense so that we can reach into the hands of a third person, who acquired it without legal notice and on the faith of the public records, and recover the property in satisfaction of the debt created by the defalcation.

"Suffice it is to say that plaintiff has failed to show by a preponderance of the evidence that it is entitled to be decreed the owner of any of the four mineral interests herein sought.

"Therefore let there be judgment in favor of the defendants and against the plaintiff rejecting plaintiff's claim at its costs."

Judgment affirmed at plaintiff's costs.