*65
 
 MOISE, Justice.
 

 The voluminous records in this litigation disclose that there are two separate suits involved — No. 40,803 and No. 40,804, which have never been consolidated. These suits represent two different causes of action, with separate litigants, imposing on the trial judge great labor and added responsibility, and necessitating the rendering of separate and distinct judgments. 223 La. 79, 64 So.2d 850. We take it that the defendants let all bars down because of the charge of fraudulent conspiracy, and thus, the reason for taking evidence in both cases at the same time.
 

 We will now consider the appeal of plaintiffs from the judgment of dismissal in this suit — No. 40,803. The gravamen of petitioners’ complaint is that McKendrick and Tennant formed a conspiracy to defraud them and, therefore, plaintiffs’ petition the court:
 

 (a) To have annulled certain instruments described in the record;
 

 (b) To be decreed the sole and only owners of the mineral interest described in their petition;
 

 (c) To be decreed the owners of $5,200 of a $17,300 oil payment;
 

 (d) To render judgment in their favor, in solido, against McKendrick and Tennant, Jr. for the sum of $12,000; and
 

 (e) That they receive an accounting from Tennant, Jr.
 

 The judgment of the district court was in favor of the defendants. It is based on a finding of facts. The burden is now on plaintiffs to show that such finding is manifestly erroneous. Eals v. Swan, 221 La. 329, 59 So.2d 409; Moser v. Moser, 220 La. 295, 56 So.2d 553; Cormier v. Douet, 219 La. 915, 54 So.2d 177; and Diez v. Diez, 219 La. 576, 53 So.2d 677.
 

 The law relating to fraud applicable here will be revealed by the following:
 

 In Sanders v. Sanders, 222 La. 233, 62 So.2d 284, 286, it is stated:
 

 “In the jurisprudence of this court it has been said that the charge of fraud is a most serious one; that one who alleges fraud has the burden of establishing it by legal and convincing evidence since fraud is never presumed, and that to establish the fraud exceptionally strong proof must be adduced. (Authorities) It has also been said that evidence showing that the fraud was probable or that the circumstances partook of a suspicious character is not sufficient, and that the fraud must be established by proof stronger than the mere preponderance of the evidence. * * * ”
 

 In Aucoin v. Marcell, La.App., 38 So.2d 81, 88, it is stated:
 

 “Fraud is never presumed; it must always be alleged and proved.”
 

 
 *67
 
 In Winzey v. Louisiana Industrial Life Ins. Co., Inc., La.App., 195 So.
 
 67, 69,
 
 we find:
 

 “
 
 * * * The very basis for setting aside a contract induced by fraud is because of an error on the part of one of the parties relative to a material fact bearing on the contract which error arose because of some misrepresentation or failure to disclose certain facts by the other party. [LSA-]C.C. art. 1847.
 

 “In determining whether or not fraud has been proved, the situation of the parties and the circumstances surrounding the transaction may be taken into consideration. * * * ”
 

 In Slocomb v. Real Estate Bank of Ark., 2 Rob. 92, it is declared:
 

 “Two things are necessary to constitute fraud: the intention to defraud, and actual loss or damage, or such strong probability of it as will induce a court to interfere.”
 

 In Strauss v. Insurance Co. of North America, 157 La.
 
 661,
 
 102 So. 861, 865, it was stated:
 

 “The charge of fraud is a most serious one, and the maxim of law is that fraud is never to be imputed to any one except upon legal and convincing evidence.”
 

 See. also,
 
 37
 
 C.J.S., Fraud, §§ 16, 22, 114; Cox v. De Soto Crude Oil Purchasing Corp., D.C., 55 F.Supp. 467; Pike v. Kent-wood Bank, 146 La. 704, 83 So. 904; Articles 1848 and 1847, LSA-C.C.
 

 Our study of the record shows that the learned district judge examined thoroughly all of the issues and evidence herein through the medium of sharp eyes and a shrewd brain. In this instance there was in him the quality of Ithuriel’s spear at whose touch there stood revealed the naked truth. We shall now adopt as our own the reasons for judgment given by the trial court:
 

 “A. C. Buxton, and his wife, Mrs. Evelyn J. Buxton, residents of Gulfport, Mississippi, seek by this action to have declared null and void a number of documents they have executed. As these documents are of record in the office of the Cierk of Court and Ex-officio Recorder of Conveyances in this parish they seek to have the inscription thereof cancelled.
 

 “They also seek a solidary judgment against the defendants in the amount of $12,000.00 and an accounting of all monies received by one of the defendants, Samuel J. Tennant, Jr., by virtue of these documents.
 

 “The plaintiffs had invested in the activities of the Acadian Production Corporation and the documents they seek to have annulled are those by'which they divested themselves of the interests acquired therein' by virtue of these..investments.
 

 “In the course of- several years, beginning about the year 1939 and ending in
 
 *69
 
 1948, plaintiffs purchased stock of this corporation as well as a %28 of
 
 68%%
 
 of % interest in the mineral lease described in suit No. 14927 entitled Acadian Production Corporation of Louisiana vs. Charles S. McKendrick, et al., consolidated, with this suit for the purpose of trial. Apparently, they also advanced money to the company from time to time. * * * For this amount in Juné, 1942 the company issued to them an oil payment.
 

 “In December, 1948 they therefore owned company stock, the mineral interest mentioned and the oil payment.
 

 “They claim that the defendant, Charles S. McKendrick, the President and member of the Board of Directors of Acadian Production Corporation, was their close friend and adviser with reference to the activities of the company. Mrs. Evelyn J. Buxton was a member of the Board of Directors also.
 

 “In December, 1948 the corporation found itself financially insolvent, as described in the Court’s opinion in suit No. 14927. The result was that the Buxtons were not realizing any revenues from their investment arid had become uneasy about it. At that time the defendant McKendrick visited their home and it was agreed that they would sell their holdings in McKendrick if McKendrick could find a purchaser. This McKendrick did, in the person of Samuel J. Tennant, Jr. Accordingly, the Buxtons sold to Tennant their. interest for a'consideration equal to the sum of money they had invested in the'corporation, payable1-at the rate of $50.00 per month.
 

 “After making four payments Tennant discovered that he had failed to obtain from the Buxtons the transfer of the oil payment. He resides in New Orleans, hence he mailed the Buxtons the necessary document to complete the transaction. They refused to sign it.
 

 “Thereafter the Buxtons executed a sale of their oil payment for a cash consideration of $3500.00 and attached the documents to a draft drawn upon Tennant. Tennant refused to accept it.
 

 “In these negotiations the Buxtons had as their attorney John R. Land, Jr. As a result of negotiations between that attorney and McKendrick in June, 1949, the Buxtons agreed to sell this interest to Charles B. Gholson for a consideration of $3500.00, provided Gholson would hold them harmless from any legal action that Tennant may institute because of the deeds he had previously acquired.
 

 “Gholson was acting for McKendrick, that is, it was understood between them that the interest thus acquired belonged to McKendrick.
 

 “Gholson & Gholson, McKendrick and Tennant had become the principal, if not the entire interest holders of the lease formerly owned by Acadian and managed by1 the Moresi Lease Management, Inc. They had engaged in many, transactions relative to their., interests, .and as a result1 considerable disagreement had arisen.” ,
 

 
 *71
 
 “On June 21, 1949 they entered into a written agreement disposing of their various controversies, among which was the division of the Buxton oil payment. It was also agreed that Gholson would assign to Tennant, without warranty, the Buxton working interest that he had thus acquired. Whether or not formal transfer has been made is not shown by the evidence. The defendants, however, recognize the binding effect of the agreement and expressed their intentions to abide by its provisions.
 

 “The Buxtons claim they have a right to have these transactions set aside because they were defrauded of this property. The means used by the defendants in achieving their goal, they allege, was a conspiracy among the defendants, the principal act of which was to have McKendrick, in whom they reposed a great amount of confidence, deceitfully misrepresent the actual value of the interest they had. This was done, they claim, by his telling them that the production in the field in which they held a mineral interest and oil payment was less than 100 barrels per day, when as a fact production was about 350 barrels.
 

 “They contend that he also represented to them that an oil payment previously owed Regent Drilling Company, Inc. for an amount of money almost as large as theirs, had not been paid and had priority in payment over theirs. They also claim that McKendrick told them that the persons who had charge of the lease were improperly handling it and that there was no prospect that conditions, or the value of their interest, would improve. All of these representations, they claim, are contrary to facts.
 

 “As additional evidence of their assertions they charge the defendants with having influenced their own attorney with a payment of money, namely the sum of $200.00.
 

 “Of course, the defendants strenuously deny any conspiracy. They likewise oppose the charge of fraud and misrepresentation. They defend the action by pointing out that Mrs. Buxton was a member of the Board of Directors, and she and her husband had taken many trips to the field where the activities of the corporation were conducted, and that they had the means to acquire full knowledge of the financial conditions and activities of the company.
 

 “As a matter of fact, McKendrick is the only one who is charged with having made false representations. The plaintiffs had never seen nor knew of Gholson. They had seen Tennant once or twice. Plaintiffs contend it was once; McKendrick and Tennant contend it was twice.
 

 “The details leading up to the assignments in controversy are that in the early part of December 1948, McKendrick visited the Buxtons at their home in Gulfport. And, as usual, the conversation drifted to the activities of Acadian and how it was not paying dividends. The Buxtons say they had no intention of disposing of their interest until McKendrick gave them such
 
 *73
 
 an unfavorable financial picture of the company. Before he left they consented to sell if he could find a purchaser.
 

 “In the month of January he returned with Mr. Tennant. Whether or not it was on this trip, as the Buxtons contend, or during another trip, as McKendrick and Tennant contend, is immaterial. The fact remains that the Buxtons did sell their interest to Tennant for the sum of money they had invested in the corporation to be paid for at the rate of $50.00 per month.
 

 “The next day Mr. Buxton consulted an attorney relative to the transaction and he says that the attorney told him the transaction was no good because thereunder he could not force Tennant to keep on paying if he refused.
 

 “When Tennant forwarded by mail to the Buxtons the document to correct the transaction, Mr. Buxton again took it to an attorney. ' The attorney suggested that Mr. Buxton confer with John R. Land, Jr., who is a lawyer conversant with Louisiana law. Mr. Land is not only a Louisiana lawyer but he was also conversant with the affairs of the Acadian Production Corporation for he owned interests in the lease the corporation held and had represented it as attorney on previous occasions.
 

 “He advised the Buxtons not to sign the document and in their behalf communicated with Tennant. Tennant thereupon telephoned the Buxtons and advised them that he would not deal with Land as they were not on speaking terms. It then became impossible to deal further in the transaction.
 

 “It was then, May 1949, that the Buxtons drew upon Tennant and attached their deed to the oil payment, which Tennant refused.
 

 “From then on McKendrick dealt with the Buxtons through their attorney, John R. Land, Jr. Apparently, McKendrick had agreed to pay Land $200.00 if the Buxtons sold their entire interest for $3500.00. After the transaction was completed Land also sent his bill to the Buxtons for $250.00, (Exhibit Buxton 5A) and was promptly paid.
 

 “During this time, in the month of January, 1949, the Buxtons received from the Moresi Lease Management,’ Inc., a statement declaring that their ’earnings for the year 1948 amounted to $1,034.88. As they had received no money from the corporation in 1948 they were at a loss to understand the statement. They consulted with Land about it and he in turn communicated with the company to clarify the matter. The Buxtons claim that the sending of that statement was one of the acts to defraud them perpetrated by the defendants. Howl ever, John Gholson, the manager of Moresi Lease Management, Inc., explains the apl pearance that the Buxtons received this money when in fact they received none by stating that .all interest holders in the lease are liable to the proportion of their interest in the expenses of drilling wells f or oil and generally operating the lease, that they had planned on drilling ¡wells during
 
 *75
 
 the beginning of 1949, and instead of turning over the money to the interest holders the corporation kept it to defray the expenses of the proposed well, and. that in fact the money was used to drill wells in 1949.
 

 “In considering these issues it is at once evident that the misrepresentations the Buxtons complained that McKendrick made to them, if he did make them, for he vehemently denies having done so, could have been the basis of their motive in making their assignment to Tennant in January. However, this assignment is no longer effective and it was not until the month of June, 1949 that they finally disposed of their property. At that time McKendrick did not contact them, nor apparently, anyone else except their attorney, John R. Land, Jr. What Land told them is not in the record. It can hardly be considered, therefore, that the representations made in December and January by McKendrick were the basis for their action in June following. They engaged in considerable activities with reference thereto between those dates, and Mrs. Buxton, being a member of the Board of Directors of Acadian, certainly should or could have acquired all of the information she desired.
 

 ■ “It is not legally tenable, therefore, that the representations claimed to have been made by McKendrick regarding the low production of oil and the unpaid oil payment to Regent Drilling Company, Inc., could have been the direct cause of the Buxtons making their assignment in the month of June, 1949.
 

 “But if it were, and the representations made by McKendrick were false, it is difficult to impute them to the real defendants in this case. McKendrick does not own any of the interests acquired. Tennant is the principal owner. There is no evidence upon which to base the statement that McKendrick was acting for Tennant in the deed of June, 1949 when the Buxtons disposed of their interest. There is no basis for the statement that these two defendants had conspired in this acquisition. As a matter of fact, it is evident by the testimony that Tennant did'not know of this transaction until after it was completed.
 

 “There is no ground, therefore, for the operation of the legal doctrine upon which plaintiff relies.
 

 “This doctrine is set forth by our Supreme Court in the case of American Guaranty Co. v. Sunset Realty & Planting Co., Inc., [208 La. 772] 23 So.2d 409. This decision is authority for a number of legal statements relating to the deceit of a party to a contract. The general statement, however, upon which plaintiff must rely is that either party to. a contract is justified in believing the material representations made by the other party relative thereto and when said representations are the basis for his execution of the contract, if they are false, the courts will vitiate the agreement.
 

 
 *77
 
 “However far this opinion may be interpreted to go, it does not and cannot destroy the jurisprudence of this State that imposes upon every party to a contract thé obligation of putting forth some effort to ascertain the nature of the engagement he is confecting. Certainly, it does not relieve one who undertakes an obligation of all responsibility whatsoever in ascertaining the nature thereof.
 

 “The evidence introduced in this case shows that if McKendrick made the statement that the oil payment to Regent Drilling Company, Inc. was still outstanding that the statement was correct.
 

 “As to plaintiffs’ contention that McKendrick misrepresented the financial condition of Acadian it is difficult to understand how its predicament could be exaggerated.
 

 “Plaintiffs have shown the present value of defendants’ interests and how much money it had accumulated since they disposed of it. Its increase in value is due to the efficient management of the property after the Gholsons became associated with the company activities. Not only did they bring to it knowledge that benefited the company but they made available funds with which to properly develop the lease.
 

 “At the time these negotiations were held: with the Buxtons for the sale of their interest it was impossible to forese'e the success which has been subsequently realized. The Buxtons, and the other interest owners, had held the interests for some ten years without revenue and if the future were to be judged by the past, it was not likely that they would soon fare any better. Other interest holders at about that time were disposing of their interests at values below those received by the Buxtons.
 

 “It is plain, therefore, that to refuse the offer made them the Buxtons would be engaging in a gamble. They stated that they did not care to gamble any further. It seems evident from their testimony that this is the actual cause for their disposing of their property.
 

 “As the interest owned by the Buxtons was what is commonly called a working interest they were liable for their pro-rata share of the expense incurred in developing the lease. Considerable expense can therefore be incurred by the holder of such an interest.
 

 “The Buxtons paid no consideration for their $17,370.00 oil payment. It is conceded that it was given them just prior to the entry of the John R. Land, Jr., judgment. This judgment originally covered more interests than Acadian owned.
 

 “The defendants, in their brief, made considerable mention of this fact but no legal significance can be attached to it in these proceedings.
 

 “It is the contention of the defendants that had not the management of the lease been so profitable that this action would not have been filed because it would have lacked financial justification. There is much merit in this contention.
 

 
 *79
 
 “For. these reasons therefore let there be judgment in favor of the defendants and against the plaintiffs at the costs of the plaintiffs.” '
 

 Judgment affirmed at plaintiffs’ costs.