MILLER, Judge pro tern.
Lillian Gordon Willis brought this suit against Daisy Sanders Gordon, the executrix and sole legatee of the Succession of defendant’s deceased husband, Charles J. Gordon, to set aside a cash sale of property dated February 13, 1947, whereby Mrs. Willis conveyed the property which is the subject of this dispute to her natural father, the said Charles J. Gordon. Mr. Gordon died on June 25, 1954. The grounds for setting aside the sale were that her father fraudulently obtained her signature to the instrument and that she signed the instrument of sale through error.
The first suit seeking to have this sale to Charles Gordon decreed null and void was filed by plaintiff’s husband twenty-six months after the demise of Charles Gordon. It was then brought on the grounds that the property sold was community property and that plaintiff’s husband did not sign the act of sale. We affirmed the trial court’s holding that plaintiff’s husband was estopped to attack the sale on such ground, as in the act of sale wherein his wife, plaintiff herein, acquired the property, the husband acknowledged that the property was acquired by his wife for her separate estate, with her separate funds, under her separate administration. Willis v. Gordon, La.App., 94 So.2d 99.
This matter was next before this court when in this very suit we overruled an exception of no right of action, which had been maintained by the trial court. See Willis v. Gordon, La.App., 114 So.2d 85. The case has now been tried on the merits and the learned trial judge concluded that since the evidence preponderated in favor of the allegations of the petition, and since this court had reversed the holding sustaining the exception of no right of action, that therefore judgment must be rendered for the plaintiff. Judgment was rendered in favor of plaintiff decreeing the act of sale of February 13, 1947 null and void and further ordering the defendant to pay to plaintiff “the full amount of all rentals *800 received by said defendant from the property described in the above deed since the death of Charles J. Gordon,” From this judgment, defendant has appealed.
Plaintiff’s original suit filed December 11, 1956 sought to have the February 13, 1947 sale decreed null and void on grounds other than the fraud and error, alleging that :
(a) The statement in the deed whereby she acquired the property declaring the property purchased for her separate estate with her separate funds was incorrect; and that the property was actually community property.
(b) The statement in the February 13, 1947 act of sale that she was paid $250.00 as consideration was not true; and that she received no consideration.
(c) The February 13, 1947 sale shows that it was executed before a notary and two witnesses, but plaintiff alleged:
“petitioner executed said fictitious sale in her own home, and out of the presence of either witnesses or a Notary Public.”
(d) She never intended to deed the property to her father, as—
“she merely signed said fictitious sale in order to assist him (her father) in borrowing some money * * *; that said fictitious sale was made for convenience sake only and it was a simulation * *
(e) That her husband, as head and master of the community did not sign the February 13, 1947 sale. Therefore the property belonged to the community, and the sale by her alone was not valid.
To this petition, defendant filed, on December 18, 1956, an exception of no cause or right of action which was overruled by the learned trial judge for the written reasons assigned on January 10, 1957, holding that the plaintiff could not attack the February 13, 1947 sale by parol evidence, on the grounds alleged, but could only propound interrogatories to the defendant, or allege a counter letter (LSA-C.C. art. 2275). However, the exception was overruled for the stated reason that the proper way to enforce the parol evidence rule was to object to the introduction of parol evidence, and not through an exception of no right or cause of action. Plaintiff did nothing further in the suit until June 17, 1958, when she filed an amended and supplemental petition alleging for the first time fraud and error, as follows:
“That said (February 13, 1947) deed was obtained by fraud and was signed through error as she was informed by her father, Charles J. Gordon, that she was signing a mortgage or some instrument permitting her father to borrow $250.00 and that she never knew that she had signed a purported deed until after his death.” (emphasis added)
Thereafter, the trial judge sustained the original exception of no right of action levelled at plaintiff’s right to contend that the sale was null and void because the property was community property, holding that this was a cause of action which belonged to the husband alone. It was this holding which was overruled by this court in Willis v. Gordon, 114 So.2d 85, where we held that plaintiff should have her day in court to prove if she could, that the February 13, 1947 deed “could be held null on account of fraud or other grounds.”
All of the parties who signed the February 13, 1947 deed, excepting the plaintiff, died prior to the trial of this case. The record does not show the dates of death of the notary public and the two witnesses. On the same date that the deed was executed, plaintiff’s father mortgaged the same property by executing a mortgage before the same notary and two witnesses. This mortgage was recorded at the same time that the deed which is the subject of this dispute was recorded and bears the next filing number in the records of East Baton *801 Rouge Parish. Notwithstanding this fact, the plaintiff did not know about this mortgage until it was filed in evidence by the defendant near the close of the trial.
In his written reasons for judgment, the distinguished trial judge found:
“Counsel for defendant urges that plaintiff admitted she knew she was signing a deed to the property. Of course she knows that now. Some of her testimony taken on the trial and in her deposition is to the effect that she knew it then. However, considering her testimony as a whole, she has steadfastly maintained that she signed papers only to assist her father in borrowing money.”
The finding that “she signed papers <?nly to assist her father in borrowing money” is not a finding that her father fraudulently represented the deed to be a mortgage, and does not mean that plaintiff was induced to sign the sale because her father told her it was a mortgage. That finding of fact is not a finding of fraud itself.
A review of her testimony, since hers is the only voice not stilled by death, is in order. On direct examination, plaintiff testified :
“Q. Lillian, on or around February 13, 1947, did you sign any paper for your father at his request ?
“A. Yes I did.
“Q. Where were you when you signed this ?
“A. At home in my kitchen, just me and Daddy.
“Q. Did you subsequent, or after that date, go before a notary and acknowledge this deed?
“A. No, sir.
“Q. No witnesses to the — ■
“A. No witnesses, and honestly I did not read the paper that I signed.
“Q. What did your father tell you it was ?
“A. He was going to try to borrow some money on those two lots.
“Q. Did you know, or did he tell you it was a deed or what did he tell you?
“A. It was a mortgage note for him to borrow the money.
“Q. Authorizing him to borrow the money on the lots ?
“A. Yes, and that is why I signed it.
“Q. Did he pay you any money to sign it?
“A. No sir, he has never paid me any money, definitely not.
# * * * * *
“Q. Where were you and what were you doing at the time that he brought this paper to you ?
“A. I was working around at home in the kitchen doing something, around in the house. He brought this paper to me to sign, and I signed it. I have always done everything he asked me to do, I am satisfied to that.
“Q. You didn’t read it?
“A. No, sir, I did not, I’ll be honest with you. And I should have, but I had all confidence in my Daddy there was no harm. And one thing I knew that if I lost these two lots that Gene and our other property where we live would not be lost. So I signed it because I trusted my Daddy that he would be good to me as I was to him.
“Q. You were willing at that time to let him mortgage it to get the money ?
“A. Yes, sir, definitely and pay it off.”
As indicated by the trial judge, on several occasions plaintiff testified on cross *802 examination that she had signed a deed. Some of the following excerpts from her testimony were taken from her deposition and several from the trial on the merits:
“A. I told (my husband) after I had made the sale with Papa and tried to fix it so he could mortgage (the property) and borrow some money on it.”
Again in explaining the background leading up to the presentation of the deed for her signature she testified that:
"A. Daddy went down and he had a note drawn up — I don’t know who drew it up — and he brought it back and asked me to sign this note. He wanted to get $600.00. That’s the reason we (plaintiff and her father) had this property put in my special — in my name — is to use, to do what I wanted with it, so when we got ready to use it — whatever we wanted to do with that, we could do it, and then Eugene (plaintiff’s husband) wouldn’t — could-n’t have anything to do with it. And when he got this note drawn up for me to sign, he needed two people and he wanted Eugene to sign the note and Eugene would not sign this note for him to get that money. And I didn’t have $600. cash to let Papa use to do as what he want, and I told him if he wanted to mortgage those two lots then I would sign it and let him mortgage it, but I wouldn’t let him mortgage it with it all in one—
“Q. So then you made the deed over to Charlie so he could go mortgage it, didn’t you?
“A. Yes. Just as a favor. But he didn’t pay me any money for that, because if he would have had any money to pay me to turn — for that deed, he wouldn’t had to ask me to sign the note for him to borrow the money. * * *
* * * * *
“Q. So then, you told Charlie that you would give him the deed so he could get a deed in his name and you would sign that deed so he could borrow the money in his own name?
“A. Let him borrow the money in his own name.
“Q. Yes, and so—
“A. But he couldn’t do it. He never could get it.
“Q. But you actually did sign the deed over to him so he could go borrow the money in his own name, didn’t you?
“A. Yes, but I did it in my kitchen, on the table.
* * * SÍ! * *
“Q. But he told you he had to put the title in his name so he could do it. Isn’t that right?
“A. Yes, but he never could borrow the money.
“Q. But he still told you- — -he had to put the title in his name in order to— so that he could borrow money, didn’t he?”
“A. Yes, but he couldn’t even borrow the money because it wasn’t legally titled. He never did get the money.
* # * * * #
“Q. But he did tell you he had to have the deed in his name so that he could go borrow the money?
“A. Well, that was after I didn’t sign the note thing that he wanted me to sign.”
*j******
“Q. But you signed a deed putting the title to the property in Charlie’s name so he could borrow money in his name, didn’t you?
“A. Well, whatever that was, I was going to help him get the money. He *803 didn’t give me any money and he certainly was not going in front of a notary public, or anyone else, not even a witness.
“Q. You knew you were deeding the property to Charlie?
“A. I knew I was turning it over to him for him to get some money.
j{i ‡ $
"Q. Charlie didn’t tell you anything about it being a mortgage or not, he just said to sign this paper so I can have a title to go and borrow some money on it, is that what Charlie told you?
“A. Yes.
sfs * ‡ ífí ‡ ❖
“Q. That’s not my question, Lillian, I am asking you what Charlie told you at the time you signed this paper?
“A. He asked me to sign the papers for him and that he was going to borrow some money and I did what he asked me.
“Q. He didn’t tell you it was a mortgage, did he?
“A. Well, it was a bunch of papers and I don’t know what they were— mortgage those two lots, he said he was going to mortgage them, that’s what he told me he was going to do.”
This testimony demonstrates that while plaintiff sometimes referred to signing a mortgage, she more often indicated that she knew that she had signed a deed, but was doing it only to help her father so that he could mortgage the property. We agree that she was. signing papers so that her father could mortgage the property. And the paper which she signed was a deed. It is evident to us that plaintiff knew that she had signed a deed. The fact that she brought suit on the basis that the deed was a simulation rather than on the basis that her signature to it had been fraudulently obtained indicates that she did not consider the claim of fraud to be worthy of mentioning in the suit until some eighteen months after the suit was filed, some forty-seven months after her father had died, and eleven years after the deed had been signed.
The fact that the plaintiff and her husband only a few days before the deed was executed refused to sign a mortgage for the stated reason that they didn’t want to be bound for the debt, is further proof that plaintiff knew that she was not signing a mortgage when her father presented the deed for her signature.
Plaintiff testified that she paid taxes pn the property for some years prior to the sale to her father, but that all taxes after the sale were paid by or homestead exempted by her father. This would indicate that plaintiff knew that the property had been conveyed to her father.
As to plaintiff’s testimony that the deed was signed in her kitchen and outside of the presence of any witnesses or the notary public, we must note again that we have only the plaintiff’s testimony on this suN ject. And in this connection, we note that plaintiff testified on one occasion that her husband was in the house on the occasion of her father’s presentation of the deed, but on another occasion she testified that her husband was not at home at the time.
The testimony of the plaintiff in her own favor to establish a large claim against the only legatee of a deceased party is to be received with the greatest caution. It is, in itself, of the weakest character, and, unless strongly corroborated, cannot serve as a basis for a judgment of recovery. Under LSA-C.C. art. 2282, the circumstance of her being a party diminishes the extent of her creditability. See Cutler v. Succession of Collins, 37 La.Ann. 95; Caldwell v. Turner, 129 La. 19, 55 So. 695.
A stale claim long withheld from prosecution until the one against whom it *804 was preferred has died must be established with more than reasonable certainty. An unfavorable presumption is created by the delay and it can be removed only by peculiarly strong and exceptionally conclusive testimony. Succession of Hope v. First Nat. Bank & Trust Co., 198 La. 878, 5 So.2d 138; Kuhn v. Bercher, 114 La. 602, 38 So. 468; Wood v. Egan, 39 La.Ann. 684, 2 So. 191. Here the claim of fraud was not filed until more than ten years after the deed was executed. Should we accept the view that plaintiff did not know it was a deed until after her father died, the claim of fraud was not filed until forty-seven months after her father’s demise.
One who alleges fraud has the burden of proof of establishing the claimed fraud by proof beyond a mere preponderance of evidence. The distinguished trial judge held that plaintiff’s evidence “preponderates in favor of the plaintiff.” But, "preponderance of evidence” is not sufficient, even if this were not against decedent’s sole legatee, for as was stated by Supreme Court in La Croix v. Recknagel, 230 La. 842, 89 So.2d 363:
“One who alleges fraud has the burden of establishing it by proof stronger than mere preponderance of evidence. Sanders v. Sanders, 222 La. 233, 62 So.2d 284. Buxton v. McKendrick, 223 La. 62, 64 So.2d 844.”
Again the Supreme Court in American Guaranty Co. v. Sunset Realty & Planting Co., 208 La. 772, 23 So.2d 409, 430, said:
“With reference to the extent of the burden of proof on a plaintiff in this type of case, it is well settled that fraud is not presumed. The proof must be exceptionally strong, (citing cases).
* * * * * *
“In Belcher v. Booth et al., 164 La. 514, 114 So. 116, this Court, without citing any authority, stated that the party alleging fraud must prove it beyond any reasonable doubt, as in a criminal case.”
As to plaintiff’s claim that she did not receive any consideration for signing the act of sale, we quote from McGee v. Finley, La.App., 65 So.2d 384, 388 for a full answer to this claim:
“It has been repeatedly held by our courts that a vendor’s acknowledgment in an authentic act of sale that he received a stipulated sum in cash as consideration of the transfer is conclusive as to him unless he alleges and can prove that his consent and his signature to the act were procured by fraud, error or force. See Templet v. Babbitt, 1941, 198 La. 810, 5 So.2d 13. Parties to authentic acts may, even in the absence of fraud and error, assail the verity of the recitals of the deed, either by a counter letter or through answers of the other parties to interrogatories on facts and articles which have the same force and effect as a counter letter. Article 2239, LSA-Civil Code, (citing cases.)”
The cases relied on by plaintiff-ap-pellee are Baker v. Baker, 209 La. 1041, 26 So.2d 132; Hearn v. Cockerham, La.App., 66 So.2d. 17, Houghton v. Houghton, 165 La. 1019, 116 So. 493 and Hibernia Bank & Trust Co. v. Louisiana Avenue Realty Company, 143 La. 962, 79 So. 554. These cases are inapposite. In the Baker case, so far as the record indicates, none of the parties to the instrument had died, and the evidence proved “beyond any doubt” that the vendor never intended to sign a deed, but only a mortgage. In the Hearn case, the “convincing evidence” was to the effect that no consideration was paid for the deed, and the court decreed that the property should be brought back into the decedent’s estate. One of the purchasers admitted that he did not pay any money for the deed. Again in the Houghton case, the issue was whether or not the deceased parent had deeded property without having re *805 ceived proper consideration therefor. The court found as a fact that the father had not been paid for the property and therefore set aside the sale. The Hibernia Bank suit was brought by a creditor to declare certain contracts executed by the debtor to be simulations. There is no suggestion that any of the parties to the contracts passed away prior to the filing of the suit.
For these reasons, the judgment against Daisy Sanders Gordon is reversed, annulled and set aside, and it is ordered that Lillian Gordon Willis’ demands be dismissed at her cost.
Reversed.