**ALLIED OIL WORKERS UNION**

v.

**ETHYL CORPORATION.**

Civ. A. No. 2594.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Sept. 5, 1962.

Thomas J. Meunier, New Orleans, La., for plaintiff.

Charles W. Phillips, Baton Rouge, La., for defendant.

WEST, District Judge.

### REASONS FOR JUDGMENT

This controversy arises out of the resignation on February 9, 1962, of nine employees of the defendant company who were, at the time of their resignation, and still are, members of the plaintiff union. Based upon a claim by the plaintiff union that the resignations of the nine employees involved were not in fact voluntary, reinstatement of these employees was sought by means of the applicable grievance procedure set forth in a collective bargaining agreement which was, at the time of the resignation of these employees, in existence between the plaintiff union and the defendant company. Failing in this attempt at reinstatment, the plaintiff now alleges that the resignations of the nine employees involved were not voluntary resignations but instead were procured by fraud and deceit practiced by the company, in concert with certain union officials, and that thus, the resignations of the employees in question are null and void, and contrary to their seniority rights, and in violation of the collective bargaining·agreement between the union and the company. The plaintiff union seeks a declaratory judgment that the nine men in question did not voluntarily resign but were illegally terminated by the company in violation of their seniority rights and in violation of the applicable provisions of the collective bargaining agreement, and for a mandatory injunction ordering and requiring the defendant company to comply with all of the provisions of the collective bargaining agreement, and for an order requiring the defendant company to immediately re-employ the nine employees, with all seniority rights, and with all other rights accorded to them under the provisions of the collective bargaining agreement.

This case was tried to the Court, without the intervention of a jury, on May 15, 1962, and was submitted, subject to the filing of briefs by both parties. After having considered the rather extensive testimony adduced on the trial of this case, together with the pleadings, stipulations, exhibits, arguments of counsel, and briefs filed, this Court comes to the conclusion that the plaintiff cannot prevail in this matter, and in connection therewith, makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

**1.**

Plaintiff, Allied Oil Workers Union, is an unincorporated labor organization, with its principal office in the City of Baton Rouge, Louisiana, located in the Eastern District of Louisiana. The de-

fendant, Ethyl Corporation, is a corporation organized under the laws of the State of Delaware, qualified to do and doing business in the State of Louisiana, and hence, within the jurisdiction of this Court.

**2.**

During all times pertinent to this suit, there existed between plaintiff and defendant a collective bargaining agreement, which provided, among other things, for methods by which employees in the affected bargaining unit might be terminated by the company during a reduction in force, and also provided for methods of representation by the union, through its officers, counsels, etc. of the employees in the bargaining unit.

**3.**

During the month of January, 1962, the company, for legitimate reasons, decided that it would be necessary to lay off fifty-one employees in the unit represented by the plaintiff union. According to the notification given by the company to the union, this lay off was to be accomplished according to the seniority provisions of the union contract, with the exception of a certain few specific instances, not important to this controversy, where certain particular employees were deemed essential and were to be held out of turn.

**4.**

Prior to the lay off scheduled for February 9, 1962, the plaintiff and defendant had entered into a written agreement whereby anyone scheduled to be laid off who voluntarily resigned between January 22 and February 2, 1962, could draw certain agreed severance pay, and his resignation would reduce by one the number of employees involved in the proposed lay off, said agreement being signed on behalf of the plaintiff union by Elmo F. Rogers, President, and E. Hawley Rhorer, Secretary. The provisions of this agreement were relayed to the employees involved by said union officials. At the time the written agreement was entered into relative to the resignation of employees involved in the

lay off, a verbal agreement was entered into between the defendant company and the same union officials relative to a possible resignation of employees not scheduled to be laid off. This agreement provided that any employees not scheduled to be laid off, who voluntarily resigned by February 2, 1962, would also receive certain severance pay, and any such resignations would also be applied against the fifty-one contemplated lay offs. The employee members of the union were advised by the same union officials of this verbal agreement, and of their right to resign and receive severance pay if they wished to do so. There were four employees who took advantage of this latter offer.

**5.**

The nine employees involved in the present controversy were not included in the scheduled lay off because of their seniority rights, and they did not voluntarily resign prior to February 2, 1962 as per the agreements between the company and the union.

**6.**

On February 5 and February 6, 1962, it developed that because of the forthcoming lay off scheduled for February 9, 1962, and the personnel shifts required by the lay off, twelve job vacancies were created which would have to be filled either by bid or by draft.

**7.**

Pursuant to the provisions of the collective bargaining agreement, when job vacancies occurred, employees with certain seniority rights had the right to bid for available jobs. Seven of the twelve job vacancies created by the lay off were filled on a voluntary basis by bids from employees with seniority rights prior to the scheduled lay off of February 9, 1962. This left five jobs to be filled by draft.

**8.**

Under the provisions of the collective bargaining agreement, when it was necessary to fill a vacant job by draft, the draft was directed to the employee in the mechanical helpers classification, or pool,

with the least seniority. That man, if qualified, was obliged to take the vacant job for which he was drafted.

### 9.

There has been a long standing dispute between the company and the union as to the method to be used to fill such a job vacancy by draft if it developed that the most junior man in the helpers pool, when drafted, could not qualify for the job. It had long been the contention of the union president, Mr. Elmo Rogers, and the union vice-president, Mr. J. O. Aucoin, that if the junior member in the helpers pool could not qualify for such a job, it would be a violation of the collective bargaining agreement for the company to return that man to the helpers pool and draft the next most junior man for the job. It was their contention that the contract did not provide for such a situation, and that if such a situation developed, a special agreement between the company and the union would be necessary. It was their contention that in such a case, the company had neither the right to discharge the junior helper not qualified for the job, nor to draft the next most junior man for the job. These union officials had no suggestion as to how the job should be filled, but merely took the position that in such an eventuality, some agreement between the company and the union would be necessary. The company, on the other hand, had in the past contended that they had the right to return such an unqualified man to the helpers pool, and to draft the next most junior man, which they, the company, had done on many previous occasions. On some of these previous occasions, grievances had been filed based not upon the procedure followed, but only on the question of the qualifications of the junior man returned to the pool.

### 10.

All of the nine employees involved in this litigation were employed in the helpers classification or pool who were subject to draft for various jobs, including the five job vacancies not filled by voluntary bid, and which jobs were to be filled by draft of men from the helpers pool subsequent to the lay off on February 9, 1962.

### 11.

On February 7, 1962, Mr. J. O. Aucoin, vice-president of the plaintiff union, went to the office of Mr. John Q. Bass, an employee of the defendant company employed in the Industrial Relations Department, to discuss the status of an employee by the name of W. W. Harris, who was one of the nine employees involved in this present dispute. It developed that Harris was scheduled to be drafted for a job in the Operating Department, and the company had determined that he was not qualified to fill that job. Mr. Bass also, at that time, called to the attention of Mr. Aucoin that the same situation might well develop with regard to filling the five vacancies created by the lay off of the fifty-one employees because of the fact that there were eight other employees who, after the lay off, would be junior men in the helpers pool, and whose qualifications to fill jobs for which they might be drafted were questionable.

### 12.

The union, through its president, Mr. Rogers, and its vice-president, Mr. Aucoin, remained steadfast in their position that according to their interpretation of the collective bargaining agreement, if the junior man in the pool could not qualify for the job for which he was drafted, he must be returned to the pool and that the company could not, under any circumstances, draft the next most junior man. In view of this position taken by the union officials, the company officials advised the union officials at that time, that should such a situation develop, it would be necessary for the company to take the position that they would terminate the employment of the most junior man if he was not qualified for the job for which he was drafted, and hire, from the outside if necessary, someone to fill the vacancy.

### 13.

It was Mr. Aucoin who then asked Mr. Bass if he thought the company might

permit these nine employees whose qualifications were questioned to voluntarily resign, with severance pay, even though the previously fixed time for submitting voluntary resignations had expired. Mr. Bass informed Mr. Aucoin that he was not authorized to pass upon such a suggestion, but that he would pass the suggestion along to other company officials.

14.

Another conference on this matter was held on February 8, 1962, at which time, in view of the steadfast position taken by the union officials that the company did not have the right to return a drafted man to the helpers pool and draft the next most junior man, the company advised the union officials, Mr. J. O. Aucoin, and Mr. Harry Rohrer, that it was now officially taking the position that if a man drafted from the helpers pool did not qualify for the job for which he was drafted, the company had the right, under their interpretation of the collective bargaining agreement, to terminate the employee and fill the job or jobs by men hired from the outside if necessary. They further made known to these union officials that they would, in fact, follow this procedure in the future, including in all situations that might arise as a result of the contemplated lay off.

15.

When this position of the company was made known to Mr. Aucoin, on February 8, 1962, he, acting with the knowledge and approval of Elmo Rogers, the union president, proposed that in view of the questionable qualifications of the nine men involved, the company give these nine man a chance to voluntarily resign on Friday, February 9, 1962, the day of the scheduled lay off, with severance pay, just as though they had voluntarily resigned prior to February 2, 1962, pursuant to the previous agreement between the company and the union. On the same day, February 8, 1962, the union officials posted a notice of a meeting of the union for that night, which meeting was held, for the purpose of discussing with the union members the proposal made by Aucoin to the company to allow the men whose qualifications had been questioned to voluntarily resign, with severance pay, on the next day. The evidence clearly shows that this matter was discussed at the union meeting, at which several of the men affected were actually present, and that during that meeting, the union adopted a resolution authorizing this arrangement to be made with the company.

16.

At about 8:00 o'clock a. m. on the following day, February 9, 1962, the company officials again met with Rogers and Aucoin and Rhorer, and Robert H. Chandler, a member of the union council, at which meeting the union representatives present stated that a resolution had been passed by their union the night before requesting the company to offer severance pay to these nine employees whose qualifications had been questioned if they voluntarily resigned. The company agreed to this proposition, and it was further agreed that Rogers and Aucoin would immediately go into the yard and contact the employees affected and determine whether or not they wished to accept this proposition.

17.

By noon that day, all nine of the employees involved had signed voluntary resignations and accepted severance pay and terminated their employment with the company.

18.

There is no question but that the union president, Elmo Rogers, and the vice-president, J. O. Aucoin, advised and even urged these employees to voluntarily terminate their employment, and there is little doubt that these union officials convinced these employees that if they did not voluntarily resign, their employment would be terminated, without severance pay, should they be found not qualified to fill a job for which they might be drafted.

19.

There is no evidence of any kind in this record to show that these union officials

in any way informed or advised these nine employees that the union would, on their behalf, contest the right of the company to terminate their employment if they were found not qualified for a job for which they were drafted, even though these same union officials, on the trial of this case, strongly urged that such a procedure of termination would be a violation of the provisions of the collective bargaining agreement. On the contrary, they urged these employees to voluntarily resign, and represented to them that the company could and would, terminate their employment if they were not qualified for a job for which they were drafted. Even though Rogers and Aucoin claim to disagree with the company's position that it has the right to terminate an employee for lack of qualifications, nevertheless, they at no time even so much as indicated to these nine employees that the union would back them up and fight for their right to retain their employment rather than to be terminated in accordance with the company's stated policy, but on the contrary, these union officials gave these nine employees every reason to believe that the company could, in keeping with the contract agreement, so terminate their employment for lack of qualifications for a job for which they might be drafted.

20.

Whatever pressure was exerted on these employees to voluntarily resign their jobs came from their own duly elected union representatives, and not from any company official. The initial suggestion that these employees be allowed to voluntarily resign came from the union officials, and the direct recommendation to these employees that they accept this offer of severance pay in return for a voluntary resignation came directly from the union officials to the employees, and not from the company officials.

21.

There is not even the slightest bit of evidence in the record of this case to indicate that the company, or any of its officials or representatives, used any fraudulent or deceitful means to induce these employees to voluntarily resign. It is a fact, however, that the union officials involved exerted pressure on these employees to voluntarily resign rather than place the union in the position of having to defend their right to continued employment should the company follow through with its declared intention of terminating an employee who was found not qualified to fill a job for which he was drafted.

22.

Following the resignation of the nine men involved, Rogers and Aucoin, president and vice-president respectively of the plaintiff union, were suspended by the union from their union offices, by action of the council of the union, for their part in bringing about the termination of these nine employees. There is simply no doubt whatsoever from the record in this case that whatever duress or coercion was exercised on these nine employees was exercised directly by their own union officials and not by the officials of the defendant company.

CONCLUSIONS OF LAW.

1.

The Jurisdiction of this Court is invoked pursuant to the provisions of Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, the plaintiff claiming that the employment of the nine men in question was terminated illegally by the company in violation of the collective bargaining agreement between the company and the union.

2.

Since it is alleged by the plaintiff that the resignations of the nine employees in question were obtained by fraud and duress on the part of the defendant company, and since fraud may never be presumed, proof thereof must be completely convincing and such proof must be more than by a mere preponderance of the evidence. West v. Kerksieck, La.App., 104 So.2d 213; Sanders v. Sanders, 222 La. 233, 62 So.2d 284;

Buxton v. McKendrick, 223 La. 62, 64 So.2d 844.

**3.**

The nine employees, whose termination of employment is questioned by the plaintiff herein, were, at all times pertinent hereto, lawfully represented by the plaintiff union insofar as bargaining between the employees and the company is concerned, and the bargaining conducted in connection with the ultimate resignations of these nine employees was properly conducted between the company officials and the properly elected officials of the union. The union officials who participated in this bargaining which ultimately led to the resignation of the nine employees in question, were fully authorized by the union to negotiate with the company and to enter into binding agreements on behalf of the union and its members.

**4.**

█ There being absolutely no evidence whatsoever in this case to support the plaintiff's charge of fraudulent activities on the part of the defendant company or its representatives, the plaintiff has completely failed to bear the burden of proving that the company in any way acted fraudulently or in any way violated the terms of the collective bargaining agreement in question. On the contrary, the evidence clearly supports the conclusion that the situation concerning the possible termination of employment of the nine men in question was properly discussed in complete accordance with the terms of the collective bargaining agreement, between the company officials and the union officials, and that as a result of these discussions, and negotiations, the position of the company and the alternatives available to these nine employees, were properly conveyed to the employees by the duly elected union officials while acting in their official capacity as representatives of these employees.

**5.**

It may well be that these nine employees tendered their resignations to the company only because they were poorly represented, misled, misinformed, or improperly advised by their own union officials. However, where there is no showing of any fraudulent or other improper activities in connection therewith on the part of the company representatives, no valid reason exists to sustain the plaintiff's contention that the resignations were obtained by the company in violation of the collective bargaining agreement. On the contrary, all of the bargaining involved here was conducted in complete accordance with the collective bargaining agreement. After negotiating, the union officials themselves advised these employees to accept severance pay and resign from their jobs. If these employees were in any way coerced, they were coerced not by the company representatives, but by their own duly elected union officials.

**6.**

This Court finds absolutely no indication of fraud or bad faith on the part of the defendant company or its representatives, and further finds that the termination of employment of the nine employees involved was brought about solely and entirely through their own voluntary actions, based upon the advice and guidance received by them from their own duly elected union representatives, who were, at the time, acting within the course and scope of their official union duties.

**7.**

It is unnecessary for this Court to pass upon the question whether or not the company had a contractual right to terminate, for cause, an employee who was drafted for a job for which he was not qualified. Had these employees refused to voluntarily resign, this question might then have been brought on for decision. However, in view of the fact that this Court finds that these employees did, in fact, voluntarily resign, even though such voluntary resignations may have been ill advised by their union officials, it is the conclusion of this Court that the evidence fails completely to sustain the plaintiff's charge that the resig-

·nations were procured in any way through fraud or duress on the part of the company or its representatives, and therefore, the plaintiff's complaint must be dismissed. Counsel for defendant will prepare and present a judgment in accordance herewith.